IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES SHERMAN, et al., | § | |
| | § | No. 206, 2017 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 61290375 |
| STATE OF DELAWARE | § | |
| DEPARTMENT OF PUBLIC SAFETY, | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: April 6, 2018
Decided: June 26, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Edmund Daniel Lyons, Jr., Esquire *(argued)*, The Lyons Law Firm, *Attorney for Appellant, James Sherman et al.*

Lynn Kelly, Esquire *(argued)*, Michael F. McTaggart, Esquire, Department of Justice, Wilmington, Delaware, *Attorney for Appellee, State of Delaware.*

**STRINE**, Chief Justice, for the Majority:

## I.        Introduction

This is a difficult and unusual appeal, in the sense that the appellant's primary argument, when read closely, is not so much addressed to error on the part of the trial judge as to the prior rulings of this Court that put the trial court in the impossible position of framing jury instructions that required the jury to make findings of fact, when the only open issues were not ones of fact, but of law.

The awful facts of the case are, as one small blessing, unusual, too.  The undisputed facts at the center of this case are that Jane D.W. Doe, the deceased plaintiff whose estate is the appellant, was validly arrested by a Delaware State Police Officer for shoplifting, and "was subject to an outstanding *capias*."[1]  Doe alleged that, rather than properly processing her arrest, the Officer instead told her that if she performed oral sex on him, he would take her home and she could just turn herself in on the *capias* the next day.[2]  If she refused, he would "take her to court, where bail would be set, and . . . she would have to spend the weekend in jail."[3]  The Officer originally denied that the oral sex occurred, but after DNA evidence of the oral sex was found on Doe's jacket, he claimed that he "didn't tell her [he] was going to do anything for her . . . .  She just started coming on to

---

[1] *Doe v. State*, 76 A.3d 774, 775 (Del. 2013).
[2] *Id.*
[3] *Id.*

1

[him] . . . [and he] made the mistake of engaging in[] it."[4] But the fact that the Officer received oral sex from Doe while she was under arrest is not disputed.[5] And the State charged the Officer with crimes, including: i) "intentionally compel[ling] or induc[ing] [Doe] to engage in sexual penetration/intercourse;" and ii) "solicit[ing] a personal benefit from [Doe] for having violated his duty" to bring her in on her *capias*.[6] Although the State seems to have eventually come to a somewhat different position in this civil case, as we shall discuss, to charge the Officer under either of these theories, the State would have needed to be confident that the Officer abused his authority over Doe to obtain sex from her in exchange for releasing her on her own recognizance.[7]

---

[4] App. to Opening Br. at 100–01 (Interview of [the Officer]) (Q. "[H]er allegation is that she performed oral sex on you in your police car in the front seat . . . . So, [] you are telling me that nothing happened?" A. "No, nothing happened."); *id.* at 120. Both Doe's and the Officer's statements were admitted into evidence at trial. State's Answering Br. at 37.

[5] Oral Argument at 26:08–26:15, *Sherman v. Dep't. of Pub. Safety* (No. 206, 2017), https://livestream.com/accounts/5969852/events/8066882/videos/170525984/player (The Court: "There is no question that the oral sex happened while she was under arrest, right?" State: "Correct.").

[6] App. to Opening Br. at 134 (Complaint and Warrant for [the Officer]).

[7] *See* WAYNE R. LAFAVE ET AL., 4 CRIM. PROC. § 13.1(b) n.34 (3d ed. 2014) (explaining the "common assumption" that the prosecutor can proceed only when she believes that the defendant is guilty); Sarah Anne Mourer, *Believe It or Not: Mitigating the Negative Effects Personal Bias and Belief Have on the Criminal Justice System*, 43 HOFSTRA L. REV. 1087, 1096 (2015) (noting that "it is clear that the prosecutor must believe that the defendant is guilty to proceed to trial"); Alafair S. Burke, *Prosecutorial Agnosticism*, 8 OHIO ST. J. CRIM. L. 79, 79 (2010) ("Most legal ethicists maintain that an ethical prosecutor should pursue criminal charges against a defendant only if the prosecutor personally believes that the defendant is guilty."); Bruce A. Green, *Why Should Prosecutors "Seek Justice"?*, 26 FORDHAM URB. L.J. 607, 640–41 (1999) ("Prosecutors have the power, freedom and responsibility to make decisions for the sovereign in the criminal context. . . . They must satisfy themselves of an individual's guilt as a precondition to determining that the conviction of an individual is an end to be sought on behalf of the state or the federal government."); Bennett L. Gershman, *A Moral Standard for the Prosecutor's Exercise of the*

What is clearly disputed in this appeal is whether the jury verdict finding that the State of Delaware is not responsible in tort as the officer's employer for this misconduct should be affirmed. We agree with Doe that the jury verdict should be vacated, and we order that judgment be entered in Doe's favor on the issue of liability. But we do not do so because either the trial judge erred or the jury somehow did something wrong.

We do so because the jury was improperly asked to decide whether the employer of a police officer who received oral sex from an arrestee for his own personal gratification, and with no purpose to serve his employer, was acting within the scope of his employment. This question was submitted to the jury because this Court found in its initial decision ("*Doe I*") that the jury should decide the issue.[8] In a second decision ("*Doe II*"), we adhered to the law of the case and did not revisit that earlier ruling.[9] In this decision, we admit that we erred in leaving this issue of

---

*Charging Decision*, 20 FORDHAM URB. L.J. 513, 522 (1993) ("[B]efore making the ultimate decision to charge, the prosecutor should then assure herself that she is morally certain that the defendant is both factually and legally guilty . . . . Finally, the prosecutor who acknowledges moral uncertainty about a defendant's guilt but decides nonetheless to bring charges, violates the prosecutor's special obligation to seek justice, and tacitly invites the system to miscarry.").

[8] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) ("The third factor—whether [the Officer] was activated in part to serve his employer—has been construed broadly as a matter for the jury to decide.").

[9] *Sherman v. State*, 133 A.3d 971, 979 (Del. 2016) ("In our 2013 opinion, this Court held that the question of whether an employee acted in the scope of employment 'is ordinarily one for decision by the jury.' The Superior Court correctly determined that our 2013 holding is the law of the case and, accordingly, properly denied Doe's motion for summary judgment.").

law to the jury, and leaving the Superior Court in the impossible position of crafting sensible jury instructions to implement a mandate that was not well-thought-out.

The question of whether the State is liable as an employer for the Officer's sexual misconduct turns on these related questions of law, not fact:

> Is § 228 of the Restatement (Second) of Agency's requirement that the employee's actions be motivated in part to serve the employer satisfied if the Officer's misconduct took place when he had made a valid arrest and was in the course of processing that arrest?

> Or is that provision only satisfied if the specific tortious conduct that occurred during that period was itself motivated in part to serve the Officer's employer?

In *Doe I*, we all but held that the correct answer was the former, not the latter, but instead of holding that as a matter of law, we confusingly stated that the question of whether the Officer's conduct was in the scope of his employment should be left to the jury. And we directed the Superior Court to § 228 of the Restatement (Second) of Agency as the appropriate test for the jury to apply in doing so. But § 228 includes a Motivation Prong that requires the tortious conduct to be "actuated, at least in part, by a purpose to serve the master."[10] So our ruling had the effect of directing the Superior Court to ask the jury whether the sexual misconduct was motivated in part by the Officer's desire to serve his employer, when that question could only be answered in the negative because Doe never argued that it was. For that reason, Doe

---

[10] Restatement (Second) of Agency § 228(1)(c) (1958).

4

argued in her first appeal to this Court that § 219 of the Restatement,[11] which is a complement to § 228, applied to relieve her of the obligation to show that the Officer's wrongful conduct was motivated by a desire to serve his employer. But we failed to address that part of Doe's argument.

In reaching our decision in this appeal, we admit that we depart from the law of the case. We do not do so lightly, but the doctrine of law of the case must give way when adhering to it would produce an injustice.[12] It is plain to us that our earlier failure to give more precise consideration to the specific questions of law presented by this case left the Superior Court and the parties without the ability to get a ruling on their dispute that took into account the precise arguments they were making. As important, we believe it is critical that in this sensitive area, we clarify the legal provisions that will apply if another case of this kind is filed.

Courts in other jurisdictions, like this Court in *Doe I*, have been tempted by the equities in the context of cases like this to stretch or even ignore the terms of § 228 to justify finding *respondeat superior* liability. In this case, for example, *Doe I* implied that the wrongful act itself need not be motivated in part by a desire to serve the employer, even though that is what § 228 and its commentary plainly require.

---

[11] *Id.* § 219.
[12] *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (stating that the law of the case doctrine is not an "*absolute* bar to reconsideration of a prior decision" and should give way when the decision establishing it is "clearly wrong" or "produces an injustice").

But to provide clarity for other cases going forward, we refine our prior ruling in *Doe I* and hew to a reading of § 228's Motivation Prong that requires that the wrongful act must itself be motivated in part by a desire to serve the employer. We also clarify that § 228's Foreseeability Prong, requiring that, "if force is used, the use of force is not unexpectable," requires that the general risk of the wrongdoing, not the specific risk of the employee engaging in that conduct, be foreseeable.[13]

In this decision, we find that § 228, which has been adopted as Delaware law,[14] should operate within the context of its Restatement counterpart, § 219, as the Restatement intends. Section 219 "enumerates the situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment."[15] When § 219's exceptions apply, an employer can be held responsible under *respondeat superior* even if § 228 is not satisfied. Two subsections of § 219 have potential applicability to cases like this: § 219(2)(d), which provides an exception to the scope of employment requirement in cases where the employee "was aided in accomplishing the tort by the existence of the agency

---

[13] Restatement (Second) of Agency § 228(1)(d) (1958).

[14] *See Wilson v. Joma, Inc.*, 537 A.2d 187 (Del. 1988); *Coates v. Murphy*, 270 A.2d 527 (Del. 1970); *Draper*, 181 A.2d 565; *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200 (Del. 2015) ("In determining whether tortious conduct is within the scope of employment, Delaware courts will consider the factors outlined in the Restatement (Second) of Agency . . . .") (citing Restatement (Second) of Agency § 228 (1958)).

[15] Restatement (Second) of Agency § 219 cmt. e (1958).

6

relation," and § 219(2)(c), which does the same for cases in which the employee's "conduct violated a non-delegable duty of the master."[16]

Here we hold that, as a matter of law, if a police officer makes a valid arrest and then uses that leverage to obtain sex from his arrestee, his misconduct need not fall within the scope of his employment under § 228 to trigger his employer's liability.[17] In so finding, we take into account the unique, coercive authority entrusted in our police under Delaware law, and the reality that when an arrestee is under an officer's authority, she cannot resist that authority without committing a crime. Because the Officer's position aided him in obtaining sexual favors— satisfying § 219(2)(d)—and the State owed a non-delegable duty to safeguard the arrestee from harm while she was under arrest—satisfying § 219(2)(c)—Doe does not have to satisfy § 228 for the State to be liable for the Officer's sexual misconduct.

We then address a question that arguably should not even be in the case. The State charged the Officer with two crimes that depended on the Officer having asked Doe for sex in exchange for her release—the antithesis of voluntary consent. Despite that, at trial, the State insisted that the judge leave the jury to decide whether Doe consented to the Officer's desire for sex.[18] In this decision, we hold that an arrestee

---

[16] *Id.* § 219(2)(c); *id*. § 219(2)(d).

[17] *Id.* § 228(1); *id.* § 219 ("A master is not subject to liability for the torts of his servants *acting outside the scope of their employment*, unless . . . .") (emphasis added); *see also Doe v. Forrest*, 853 A.2d 48, 56 (Vt. 2004) (describing § 219(2)(d) as "an exception to our scope-of-employment rule").

[18] Prayer Conf. Tr. (Jan. 19, 2017), at 34:1–10.

in Delaware is incapable of voluntary consent to sex with her arresting officer as a matter of law because she is prohibited from seeking to escape her arresting officer, even by peaceable means, at risk of criminal penalty. Thus, we hold that it was error to indulge the State's desire to defend itself on the ground that Doe freely chose to perform oral sex on her arresting officer.

We understand that this decision involves a question of how to allocate the risk of misconduct like this: to the employer or the victim. But this is a unique context in which victims face criminal liability even for peaceably resisting arrest,[19] victims have a rational reason to fear that they will not be believed if they refuse an officer's wrongful threat and report it to the judiciary or police authorities, and the employing agency is best positioned to put in place policies to diminish the risk of cases like this occurring. As such, where the provisions of § 219 provide for *respondeat superior* liability, we believe it is sensible to embrace § 219 and hold the State responsible for its officers' commissions of wrongful torts like this while in the course of making and processing valid arrests.

---

[19] 11 *Del. C.* § 1257(b) ("A person is guilty of resisting arrest when the person intentionally prevents or attempts to prevent a peace officer from effecting an arrest or detention of the person or another person or intentionally flees from a peace officer who is effecting an arrest or detention of the person.").

8

For these reasons, we vacate the jury verdict in this case and remand for entry of a judgment in Doe's favor on the issue of liability, with a jury trial to follow on the issue of damages.

## II.       Facts and Procedural History

As we summarized the facts of the case in *Doe I*:

On March 19, 2009, a security employee at the JC Penney store in the Christiana Mall stopped Jane D.W. Doe for shoplifting. Doe had been arrested before, and she was subject to an outstanding *capias*. After about 45 minutes, [a] Delaware State Police Officer . . . arrived at the store and took Doe into custody. He placed her in the rear of his police car and drove to several locations in the mall parking lot. Doe alleges that, at the third location, [the Officer] stopped, got out of the police car, opened the rear door, and placed Doe's hands on his genitals.

According to Doe, [the Officer] then drove to a remote area where he told her that he would let her go home if she did something in return. [The Officer] allegedly told Doe that, unless she acceded to his demands, he would take her to court, where bail would be set, and that she would have to spend the weekend in jail. The prospect of jail allegedly coerced Doe to perform oral sex on [the Officer] in the front seat of the police car. Afterwards, [the Officer] drove Doe home and told her to turn herself in on the *capias*. Doe reported the incident to Delaware State Police Sergeant Maher, who investigated and eventually arrested [the Officer] on charges of sexual misconduct, bribery and official misconduct. [The Officer] killed himself shortly after his arrest.[20]

---

[20] *Doe v. State*, 76 A.3d 774, 775 (Del. 2013).

9

Doe died in January 2015, and her estate's administrator was substituted as the plaintiff.[21]

As these facts make plain, this case could not be sadder. Both Doe and the Officer are dead, and the fact record of what happened between them on March 19, 2009 consists of the statements they made before their deaths, plus the physical evidence that makes certain that Doe was telling the truth when she said that the oral sex occurred. Given the painful nature of this case and the fact that the alleged wrongdoer has already suffered the ultimate penalty of self-inflicted death, we feel it is more empathetic to refer to both the plaintiff and defendant by pseudonyms reflecting their roles in the case. Therefore, we refer to the defendant police officer who arrested Doe as the "Officer."

The issues on appeal flow out of the confusion the trial court and the parties experienced because of the lack of clarity in *Doe I* and *Doe II* regarding the Motivation and Foreseeability Prongs of § 228, the applicability of § 219's exceptions, and the question of whether an arrestee may ever consent to sex with her arresting officer. To understand this appeal and why it takes the form it does, we

---

[21] *Id.* Doe's estate was substituted as the plaintiff in the case on April 13, 2015. This opinion continues to refer to the plaintiff–appellant as "Doe." Order Substituting Doe's Estate for Doe as Plaintiff, *Doe v. Giddings*, 2014 WL 4100925 (Del. Super. July 29, 2014).

start by discussing the Superior Court's initial ruling on the State's first motion for summary judgment.[22]

## A.       The Superior Court's First Opinion

In her complaint, Doe's theory of the case was simple.  She alleged that the Officer arrested her for shoplifting.[23]  He then told her that, if she performed oral sex on him, he would release her on her own recognizance and allow her to turn herself in on her outstanding *capias* the next day.  If she refused, he would take her to court "where she would likely be remanded for failure to make bail and she would spend the weekend in jail."[24]  Doe did not allege that the Officer's desire for oral sex was motivated in any part by his duties to the State Police or the State itself.  To the contrary, Doe's complaint alleged that the Officer's acts "were done in bad faith, with no belief that the public interest would be served thereby," and constituted assault, "intentionally and without [her] consent, [] caus[ing] [her] to be in fear of an immediate harmful or offensive contact," and battery, "intentionally and without [her] consent, [] mak[ing] contact in a harmful or offensive way."[25]

In its first motion for summary judgment, the State argued that the facts Doe pled—that the Officer sought sexual favors from her in exchange for releasing her

---

[22] *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012).
[23] Compl. ¶ 5, *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012).
[24] *Id.* ¶ 7.
[25] *Id.* ¶¶ 9, 13; App. to Opening Br. at 470 (Jury Instructions); *id.* at 471.  Doe's original complaint also alleged that the Officer raped her, but this count was not presented to the jury.

on her own recognizance—failed to satisfy the scope-of-employment test that our law uses to assess whether *respondeat superior* liability applies to an employer.[26] That test, from § 228 of the Restatement, provides that:

> Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
> (b) it occurs within the authorized time and space limits;
> (c) it is activated, in part at least, by a purpose to serve the master; and
> (d) if force is used, the use of force is not unexpectable.[27]

The State's position on the motion was straightforward. It argued that the Officer was not employed to receive oral sex, and that there was no way in which the Officer's receipt of oral sex from Doe was motivated by a desire to serve the interests of his employer, the State.[28] Thus, the State argued that, as a matter of law, Doe could not satisfy the requirements of the § 228 test because the sexual misconduct was not "motivated in part at least to serve the master"—thus failing the Motivation Prong—and the "force used in committing the rape was unexpected by the master"—thus failing the Foreseeability Prong.[29]

In response, Doe argued that because the Officer's wrongful conduct occurred in the course of a valid arrest and the Officer used his official authority to coerce her

---

[26] Defendant State of Delaware's Motion for Summary Judgment at 2, *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012) [hereinafter "State's 2012 Motion for Summary Judgment"].
[27] Restatement (Second) of Agency § 228(1) (1958).
[28] State's 2012 Motion for Summary Judgment, at 2.
[29] *Id.*

12

into performing oral sex on him, the State should be responsible. Doe cited mixed-motive cases under the Motivation Prong of § 228: cases presenting a fact question about whether the wrongful act (*e.g.*, the use of excessive force by a police officer or a security guard) was motivated in part by a desire to do one's job (*e.g.*, to secure an arrest or to keep a trespasser out). But, Doe never made a case-specific argument that the Officer's demand that she provide him with oral sex in exchange for a release on her own recognizance was motivated by anything other than a desire for his own gratification.

Doe made an important argument about why that did not matter. She pointed to another section of the Restatement that is designed to provide exceptions to § 228, § 219. Section 219 says:

(1)    A master is subject to liability for the torts of his servants committed while acting in the scope of employment.

(2)    A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a)    the master intended the conduct or the consequences, or
(b)    the master was negligent or reckless, or
(c)    the conduct violated a non-delegable duty of the master, or
(d)    the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.[30]

---

[30] Restatement (Second) of Agency § 219 (1958).

In particular, citing § 219(2)(d), Doe argued that "if an employee uses a position or power afforded by the employment relationship to commit a tort the employer is vicariously liable," and that the Officer in this case "committed the acts charged by abusing his power as a State Officer to arrest and hold [Doe] in custody."[31]

Section 219 is important because if the exceptions it articulates apply, it exempts a plaintiff from having to prove under § 228 that the tort occurred within the scope of employment. In resolving the motion in favor of the State, the Superior Court held as a matter of law that Doe's claim failed to establish the State's liability under § 228. The Superior Court held that two grounds were fatal to Doe's claim: i) the lack of any material dispute of fact, indeed lack of any argument by Doe, that the Officer's misconduct was motivated in any way by an intent to serve the State and thus § 228's Motivation Prong was not satisfied;[32] and ii) the Superior Court's view that the Officer's conduct was so outrageous and unusual that it was, as a matter of law, unforeseeable, and thus § 228's Foreseeability Prong was also not satisfied.[33] And, citing the lack of Delaware precedent applying § 219 of the Restatement, the

---

[31] Plaintiff's Response to Defendant State of Delaware's Motion for Summary Judgment at 1, *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012) [hereinafter "Doe's Response to the State's 2012 Motion for Summary Judgment"].

[32] *Doe v. Giddings*, 2012 WL 1664234, at *3 (Del. Super. May 7, 2012) ("Common sense dictates that sexually assaulting a crime suspect, a clear abuse of police authority under any circumstances, is not incidental to the arrest and detention of a suspect.").

[33] *Id.* at *4 ("A crime, such as the one allegedly committed by [the Officer] against the plaintiff, is so outrageous, and such a clear abuse of [his] position and authority as an officer of the peace, that it would be unreasonable as a matter of law for a jury to find that [he] acted in the scope of his employment.").

14

Superior Court refused to apply § 219 to relieve Doe of the obligation to satisfy § 228.[34]

## B. This Court's First Opinion

After the Superior Court dismissed her case on summary judgment, Doe took an appeal centered on the same arguments that were presented in the summary judgment proceeding below. In her appeal, Doe argued that the first three prongs of § 228 were satisfied as a matter of law because they pertain to the "general duties undertaken by the assailant at the time," and the Officer's misconduct "took place in exercising the State sanctioned power of arrest, at an authorized time and place, and was (*until the misconduct*) intended to serve the State."[35]

As to § 228's Foreseeability Prong, Doe argued that "[r]are outrageous behavior can still be within the scope of employment so long as not unexpectable and occurring in the context of otherwise authorized acts."[36] To support her argument that the Officer's misconduct was not unexpectable, Doe cited allegations of "State Troopers commit[ing] unauthorized and wrongful acts during the execution of their duties, including one rape, and multiple assaults," as well as one instance in which a "Lewes police officer pled guilty to on duty unlawful sexual intercourse

---

[34] *Id.*
[35] Doe's Opening Br. at 12–13, *Doe v. State*, 76 A.3d 774 (Del. 2013) (emphasis added).
[36] *Id.* at 15.

with a woman in custody."[37] And Doe cited to other jurisdictions' holdings that police sexual misconduct was "reasonably foreseeable,"[38] and could fall within the scope of employment.[39]

Doe also argued in the alternative that the exception in § 219(2)(d) for cases in which the employee's position aids him in accomplishing the tort indicated that the State could be held liable regardless of whether the Officer's misconduct fell within the scope of employment. She cited the Vermont Supreme Court's application of § 219(2)(d) in finding that the "position and powers of a police officer who intimidated [a] [p]laintiff into [a] sexual act could support [a] finding of vicarious liability."[40]

Our opinion in the appeal was terse. We found that, as a matter of law, Doe had satisfied § 228's first two prongs:

> [The Officer] was in uniform, on-duty, carrying out a police duty by transporting [Doe] to court. The sexual assault took place in the police car, during the time that [the Officer] was supposed to be carrying out police duties. These facts would satisfy the first two factors under the Restatement—[the Officer] was doing the kind of work he was employed to perform, and he was acting within authorized time and space limits.[41]

---

[37] *Id.* at 14.

[38] *Id.* at 18 (quoting *Mary M. v. City of L.A.*, 814 P.2d 1341 (Cal. 1991)).

[39] *Id.* at 18–19 (citing *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La. App. 1979); *St. John v. United States*, 240 F.3d 671 (8th Cir. 2001); *Moor v. Hosier*, 43 F.Supp.2d 978 (N.D. Ind. 1998); *Battista v. Cannon*, 934 F.Supp. 400 (M.D. Fla. 1996); *Carney v. White*, 843 F. Supp. 462 (E.D. Wis. 1994), *aff'd sub nom. Carney v. Vill. of Darien*, 60 F.3d 1273 (7th Cir. 1995); *Ingram v. City of Indianapolis*, 759 N.E.2d 1144 (Ind. Ct. App. 2001)).

[40] *Id.* at 22 (citing *Doe v. Forrest*, 853 A.2d 48 (Vt. 2004)).

[41] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013).

As to § 228's Motivation and Foreseeability Prongs, this Court reversed the Superior Court's ruling that, as a matter of law, Doe had failed to provide evidence raising a material issue of fact for resolution by jury trial. But we did not hold that Doe had established those remaining elements as a matter of law. Instead, we held that she was entitled to have a jury decide whether those prongs were satisfied.

It was this aspect of *Doe I* that sowed the seeds of future confusion. In particular, our ruling as to the requirement under § 228's Motivation Prong that the Officer's sexual misconduct must be motivated in part by a desire to serve his employer is what has vexed the Superior Court ever since.

Despite the reality that Doe never contended that the Officer sought oral sex for any reason other than self-gratification—*i.e.*, Doe never argued that the Officer had any partial motivation to obtain oral sex to aid the Delaware State Police or the people of Delaware—this Court held that Doe was entitled to have a jury decide the question of whether the Officer had such a motivation. Our reasoning—which referenced *Draper v. Olivere*,[42] a case in which a heavy equipment operator's assault on a motorist intruding into a construction area was found to fall within the scope of his employment—was this in full:

> The third factor—whether [the Officer] was activated in part to serve his employer—has been construed broadly as a matter for the jury to decide. If the act of cutting someone's throat can be considered a

---

[42] *Draper v. Olivere Paving & Const. Co.*, 181 A.2d 565 (Del. 1962).

17

service to the employer paving company on the theory that the employee was controlling traffic, then a sexual assault can be considered a service to the police on the theory that part of what [the Officer] was doing was transporting a prisoner.[43]

The problem with this reasoning, as we will highlight further, is that we did not ground our reference to *Draper* in a mixed-motive analogy that could fit the facts of this case. However odd it might seem that stabbing someone might be motivated in part by a desire to serve one's employer, that is not so far-fetched if the person who did the stabbing was a heavy equipment operator charged with keeping an area free from trespassers and the person stabbed was a motorist trespassing into an area the operator was expected to guard.[44] *Draper* is a mixed-motive case where the wrongful act itself could be fairly argued to have been "motivated in part" by a desire to stop the trespass and serve the employer.

*Draper* is the kind of a case for which the Motivation Prong of § 228 exists. The Motivation Prong's key role is to deal with cases in which it is possible that an employee has taken a wrongful action that advances his employer's goals but that employee also has a personal motivation to take that action.[45] Cases involving force are still beans for § 228's grinder because there are jobs, including those of police

---

[43] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).
[44] *Draper*, 181 A.2d 567.
[45] Restatement (Second) of Agency § 236 cmt. b (1958) ("The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service . . . .").

18

officers and security guards, where force must sometimes be used, and where there is a possibility of a mixed motive, such as where an officer has a legitimate reason to use a certain amount of force to arrest an offender, but gives him a lagniappe of extra oomph because he has a prior history with the offender and does not like him.[46] But, as to the wrongful conduct the Officer in this case was alleged to have committed, there was no evidence at all of mixed motivation. Doe did not allege that the Officer was partially motivated to gratify himself by a desire to serve the State.

Our decision in *Doe I* was, of course, correct to say that if there is evidence in light of which rational minds could disagree about whether the employee's misconduct was motivated in part by a desire to serve his employer, then the question of whether the Motivation Prong of § 228 is satisfied is one for the jury to resolve. But, to the extent that we implied that § 228's scope-of-employment test should always go to a jury, even if there is no issue of fact for the jury to determine, that

---

[46] *Id.* § 245 cmt. c ("To create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring the servant into conflict with others. . . . [T]he employment of servants to guard or to recapture property, to take possession of land, or to deal with chattels which are in the possession of another, is likely to lead to altercations, and the master may become liable, in spite of instructions that no force shall be exerted against the person of the possessor."); *id.* § 229 cmt. b ("An assault by one employed to recapture a chattel, while entirely different from the act which he was employed to do, which was merely to take possession of the chattel, may be within the scope of employment, unless committed with such violence that it bears no relation to the simple aggression which was reasonably foreseeable.").

19

implication is not only at odds with the Restatement itself,[47] it is also at odds with *Doe I*'s decision that § 228's first two prongs, based on the undisputed facts, were satisfied as a matter of law.

On the Foreseeability Prong, which evaluates whether the degree of force the tortfeasor used was "not unexpectable,"[48] we held in *Doe I* that the jury should decide that question, stating in full our reasoning as follows:

> Finally, to be within the scope of employment, any force used must be "not unexpectable." Several other jurisdictions have noted that sexual assaults by police officers and others in positions of authority are foreseeable risks. The record does not establish the [Officer's] conduct was unforeseeable.[49]

In so deciding, we did not give any guidance about whether foreseeability was to be determined in a general way, requiring that Doe show that there was a recognized history of police officers abusing their authority over arrestees to obtain sexual favors, or in the specific way, requiring her to show that the State had some basis to foresee that the Officer whose conduct is the focus of this case would misuse his authority for his own sexual gratification. But again, it is not clear that there was any dispute of fact on this point.

---

[47] *Id.* § 228 cmt. d ("The question of whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise it is decided by the jury.").

[48] *Id.* § 228(1)(d).

[49] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).

We finished our decision in *Doe I* by remanding to the Superior Court so that it could present § 228's Motivation and Foreseeability Prongs to the jury. We did not reach or even mention Doe's argument that § 219(2)(d) applied in this case and exempted her from the need to show that the Officer's misconduct fell within the scope of his employment. Although Doe argued this issue fairly and it remained relevant to the outcome of the case, we did not address it at all.

### C.      The Superior Court's Second Opinion

On remand from *Doe I*, the State asserted a sovereign immunity defense. The sovereign immunity defense provides that "neither the State nor a State agency can be sued without its consent."[50] But it is waived "as to any risk or loss covered by the state insurance program."[51] The State moved for summary judgment, arguing that Doe's claims were "excluded [from] coverage under the terms of the Department of Public Safety Division of State Police self-insurance plan and therefore not subject to a waiver of sovereign immunity."[52] The Officer's estate also brought a motion to dismiss, arguing that Doe's complaint against the estate was time-barred.[53]

---

[50] *Pauley v. Reinoehl*, 848 A.2d 569, 573 (Del. 2004).
[51] 18 *Del. C.* § 6511.
[52] Defendant State of Delaware's Motion for Summary Judgment 1, *Doe v. Giddings*, 2014 WL 4100925 (Del. Super. July 29, 2014) [hereinafter "State's 2014 Motion for Summary Judgment"].
[53] Motion to Dismiss [the Officer's Estate] ¶ 2–3, *Doe v. Giddings*, 2015 WL 1566597 (Del. Super. Apr. 8, 2015).

21

Doe defended these motions and sought partial summary judgment on the issue of liability. Doe argued that *Doe I* found not only that the first two prongs of § 228 could be and were satisfied as a matter of law, but so too was the Motivation Prong:

> In addressing the issue of whether [the Officer] "was activated in part to serve his employer" the Supreme Court observed that "a sexual assault can be considered a service to the police on a theory that part of what [the Officer] was doing was transporting a prisoner." *That is this case*.[54]

Doe also argued that the Foreseeability Prong was satisfied as a matter of law, citing former Delaware State Police Superintendent Thomas MacLeish's testimony that "there is a risk in police work that a small minority of police officers will engage in sexual assault or similar misconduct involving detainees in their custody," and the fact that the State Police "train[ed] against and h[ad] procedures to protect against such misconduct."[55] Doe again pointed to allegations of "individual State Troopers commit[ing] unauthorized and wrongful acts during execution of their duties, including one rape, and multiple assaults."[56] Whether because *Doe I* ignored her argument as to the applicability of § 219 and therefore left the Superior Court's

---

[54] Plaintiff's Motion for Partial Summary Judgment or Partial Adjudication Pursuant to Superior Court Civil Rule 56(a) 3, *Doe v. Giddings*, 2014 WL 4100925 (Del. Super. July 29, 2014) (citations omitted) (emphasis added) [hereinafter "Doe's 2014 Motion for Summary Judgment"].
[55] *Id.* at 4–5.
[56] *Id.* at 6; *id.* at Ex. E.

22

earlier rejection in place or for another reason, Doe did not rely on § 219 in arguing her motion, but focused solely on *Doe I* and § 228.

Doe suffered a loss on all the motions. The Superior Court granted the State's motion for summary judgment, finding that the State's insurance policy did not provide coverage for Doe's claims and that the defense of sovereign immunity was therefore not waived.[57] The Superior Court also granted the Officer's estate's motion to dismiss Doe's claims against the estate because they were time-barred.[58] The Superior Court denied Doe's motion for summary judgment on the issue of liability, noting that "[b]ased on the Supreme Court's findings on appeal [in *Doe I*], both [§ 228's Motivation and Foreseeability Prongs] remain matters for the jury to decide."[59]

### D.      This Court's Second Opinion

Doe then took her second appeal, contesting the rulings below, and in *Doe II*, this Court again got to consider the case. On appeal, the major emphasis of the parties was on the State's assertion of sovereign immunity and the Officer's estate's assertion that Doe's claims against it were time-barred. But, in fairness, Doe sought to have us re-examine our decision in *Doe I* that § 228's Motivation and Foreseeability prongs presented questions for the jury, again arguing that the

---

[57] *Doe v. Giddings*, 2014 WL 4100925, at *7 (Del. Super. July 29, 2014).
[58] *Doe v. Giddings*, 2015 WL 1566597, at *1 (Del. Super. Apr. 8, 2015).
[59] *Doe v. Giddings*, 2014 WL 4100925, at *8 (Del. Super. July 29, 2014).

23

"undisputed facts compel[led] application of the doctrine of *respondeat superior* as a matter of law."[60]

But Doe did not remind us that we failed to address the § 219 issue that was fairly raised in the first appeal but never ruled upon. Instead, Doe argued about § 228's Motivation and Foreseeability Prongs. That was understandable, of course, because *Doe I* ignored Doe's § 219 argument, asserted that § 228 was the appropriate test for determining liability in this case, and stated that it only mattered "whether the service itself in which the tortious act was done was within the ordinary course of such business."[61]

In pressing her arguments in *Doe II*, Doe relied on the part of *Doe I* that implied that she had no obligation to show that the Officer was motivated by his official duties in seeking oral sex. Doe's brief argued that it was undisputed that the oral sex occurred during a time period when the Officer was processing Doe's arrest and transporting her to court,[62] and that, as a matter of law, the Motivation Prong was satisfied under *Doe I*'s statement that "a sexual assault can be considered a service to the police on the theory that part of what [the Officer] was doing was transporting a prisoner."[63]

---

[60] Doe's Opening Br. at 36, *Sherman v. State*, 133 A.3d 971 (Del. 2016).

[61] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).

[62] Doe's Opening Br. at 32, *Sherman v. State*, 133 A.3d 971 (Del. 2016) ("There is no issue of disputed fact as to element three since the only evidence that [the Officer's] wrongful act took place during the course of an arrest and by means of abuse of the power of an arrest.").

[63] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).

24

Importantly, Doe also argued that § 228's Motivation Prong should not be submitted to the jury when the facts regarding its applicability are uncontested. To this point, Doe argued to us that:

> [Section 228's Motivation Prong] "has been broadly construed as a matter for the jury to decide." But that does not mean that this issue must go to jury if the facts are truly uncontested. . . . We believe that this Court's language in its opinion ("[a] sexual assault can be considered a service to the police on the theory that part of what [the Officer] was doing was transporting a prisoner") should be read "[would satisfy] the requirement of a service to the police." . . . *Transporting a prisoner either is or isn't a service to the police. It's what the police do following an arrest. . . .*
>
> If it is undisputed that [the Officer] acted as alleged in the course of arresting and transporting [Doe], but this issue (of service to the master) is submitted to the jury, *how could any reasonable jury find against [Doe] in light of this [r]ecord and this Court's [o]pinion? Just how would a trial [j]udge instruct the jury in this case?*[64]

Doe also argued that the applicability of § 228's Foreseeability Prong was an issue for this Court to resolve as a matter of law, because there was not a dispute of fact between the parties.[65] Rather, Doe asserted that the parties only disagreed about whether the Foreseeability Prong was satisfied.

Doe contended the Officer's sexual misconduct was foreseeable in the sense that it was foreseeable that a police officer might misuse his authority over an arrestee to procure sexual favors and that the only issue to be resolved was a legal

---

[64] Doe's Opening Br. at 31–33, *Sherman v. State*, 133 A.3d 971 (Del. 2016) (emphasis added).
[65] *Id.* at 34 (emphasis added) ("Either something is foreseeable or it is not if the facts are undisputed.").

one.[66]  And if § 228's Foreseeability Prong was satisfied by a showing of general foreseeability, Doe argued she was entitled to a ruling as a matter of law in her favor on that prong.  By contrast, if § 228 required specific foreseeability focused on the Officer, as the State suggested, Doe admitted she had no evidence that he posed a specific risk, and if, as she did not believe was the case, foreseeability of that specific kind was required, then the State was entitled to a ruling in its favor.[67]  Doe asked us to resolve the underlying legal question based on the undisputed facts.

In our decision in *Doe II*, we focused almost entirely on the sovereign immunity and timeliness issues.  We found for Doe on the sovereign immunity issue, clearing that obstacle to her recovery against the State, and we upheld the Superior Court's ruling that Doe's claim against the Officer's estate was time-barred.[68]

---

[66] *Id.*

[67] *Id.* at 34 ("Doubtless, the State will argue that Colonel M[a]cLeish had no reason to believe that [the Officer] would abuse a detainee.  But this is not a negligence but a *respondeat* claim and the foreseeability issue focuses not on [the Officer's] behavior but on that of police officers (and not just Delaware State Troopers) as a whole."); State's Answering Br. at 32, *Sherman v. State*, 133 A.3d 971 (Del. 2016) ("The State also has identified former supervisors of [the Officer] who testified that they had no knowledge of any discipline problems involving any allegations of sexual misconduct or sexual harassment by [the Officer].").

[68] *Sherman v. State*, 133 A.3d 971, 979 (Del. 2016) ("Doe did not file a suit against [the Officer's estate] until August 18, 2010, nearly fifteen months after [his] death.  However, [the Officer's estate] did not file its motion to dismiss until July 2014.  Thus, Doe contends that § 2102 does not apply because [the Officer's estate] waived its protections by waiting so long to file its motion.  The Superior Court disagreed with Doe, and held that [as a non-claim statute] § 2102's protections cannot be waived. . . . [W]e hold that § 2102 is a non-claim statute.  Accordingly, the Superior Court correctly granted [the Officer's estate's] motion to dismiss under § 2102 despite [the estate's] delay in bringing that motion.").

26

We said nothing about the merits of Doe's extensive argument that she was entitled to summary judgment on § 228's Motivation and Foreseeability Prongs. Instead, we relied on the law of the case doctrine and indicated that *Doe I* said that the question of whether § 228's Motivation and Foreseeability Prongs were satisfied was for the jury to decide. We did not focus at all on whether there was any triable issue of fact as to whether the Officer's misconduct was motivated in part by a desire to serve his employer. And we did not discuss the issue of whether general foreseeability was enough to satisfy § 228's Foreseeability Prong, or whether specific foreseeability was required.

## E.      Jury Trial and Motion for New Trial

After our decision, the Superior Court held a trial and was required to turn our decisions into sensible instructions for the jury. The reason why the parties and the Superior Court struggled in fashioning jury instructions on the issue is simple: the parties' difference of opinion did not involve issues of fact for the jury to resolve. Doe did not allege that the Officer was motivated by his official responsibilities to the State to seek oral sex from her. And, for its part, the State did not argue that the oral sex occurred outside the period when the Officer had Doe in his custody and under valid arrest. In other words, there was no fact question about § 228's Motivation Prong for the jury to resolve.

But because our prior decisions gave no guidance, the Superior Court's instruction was just a rote reiteration of the § 228 test for scope of employment, and did not frame a case-specific fact question for the jury to resolve. The Superior Court's jury instruction was:

> [I]f you find that [the Officer] committed the wrongful act, then you must next determine whether [the Officer] was acting in the ordinary course of employment during the time frame within which the wrongful act was committed. The relevant test is not whether the wrongful conduct was authorized by the State, but whether the service itself was within the scope of employment and, thus, within the ordinary course of the State's business.
>
> [The Officer] was acting within the scope of his employment if, and only if, you find all of the following by a preponderance of the evidence:
>
>   1. The conduct was of a type that [the Officer] was hired to perform;
>
>   2. The conduct occurred substantially within the authorized time and space limits of his work;
>
>   3. The conduct was motivated, at least in part, by an intent to serve his employer, on this factor, even if [the Officer] was motivated in part by a personal desire to commit the wrongful act, his conduct may still be attributed to the State where his conduct was also motivated by a desire to serve the defendant.
>
> **<u>AND</u>**
>
>   4. If force was used, the use of force was not unexpectable; i.e. the force was reasonably foreseeable.
>
> However, [the Officer's] conduct was not within the scope of his employment if his conduct was:
>
>   I.   Different in kind from what was authorized by his employer;
>
>   II.  Far beyond the authorized time or space limits of his employment;

28

III. Too little motivated by an intent to serve his employer;

**OR**

IV. Involved force that was not reasonably foreseeable.[69]

What the jury was supposed to decide was left ambiguous, because the Superior Court received no definitive guidance from this Court about whether the Motivation Prong could only be satisfied if the oral sex itself was motivated in part by the Officer's desire to serve the State.

At the prayer conference, Doe requested that the Motivation Prong of the § 228 instruction specify that it was the Officer's general conduct of arresting and transporting Doe, and not the oral sex, that needed to be motivated by a desire to serve the State. Doe argued that "of course [the oral sex] was not authorized, of course it is not a benefit to the State. If that is the test, we might [a]s well just leave. That is not the test, because an intentional tort—this intentional tort will never be of service to the State."[70]

The Superior Court rejected Doe's request to edit the instruction, despite acknowledging that it is "common sense to say that the sexual act itself was obviously not within the scope of his employment."[71] Citing *Doe I*, the Superior Court reasoned that its hands were tied as to what instruction it could give:

---

[69] App. to Opening Br. at 472–73 (Jury Instructions).
[70] Prayer Conf. Tr. (Jan. 19, 2017), at 41:2–7.
[71] *Id.* at 41:19–23.

If the Supreme Court is indicating that that particular act can be looked at, and the jury has to make its determination about whether this fits within those four factors, that is all I can do is just instruct them as to what the four factors are. That is what I am going to do.[72]

The Superior Court also denied Doe's request to instruct the jury that the Foreseeability Prong is satisfied by showing "a general problem, anywhere in the country, anywhere within police work, and not limited to the Delaware State Police."[73] Doe proposed the following instruction:

> In this case, Colonel MacLeish, the former head of the Delaware State Police in 2009, testified. If you find that Colonel MacLeish was aware of a general problem within law enforcement that some police officers had sexually assaulted people in their custody then it was not completely unforeseeable to the State that such wrongful conduct could occur.
>
> The general problem of sexual abuse by arresting police officers does not have to have involved the State Police or any police in Delaware— it is enough if on a nationwide basis there was a general problem. Also, the problem did not have to involve a majority of police officers, it is enough if it were a very small number of officers.[74]

Despite recognizing that the "particular injury suffered does not have to be foreseeable," and that the question is not whether it was "foreseeable that he, meaning [the] Officer [], would do this, but only that this risk existed,"[75] the Superior Court rejected Doe's proposed instruction and instructed the jury on that issue in this more generic way:

[72] *Id.* at 52:17–22.
[73] *Id.* at 11:4–6.
[74] *Sherman v. State*, C.A. No. N1-0C-08-178, at 13 (Del. Super. May 8, 2017).
[75] Prayer Conf. Tr. (Jan. 19, 2017), at 13:4–7.

30

A foreseeable act is one that an ordinary person, under the circumstances, would recognize or anticipate as creating a risk of injury. It is not necessary that the particular injury suffered was itself reasonable, but only that the risk of injury existed.[76]

The Superior Court also rejected Doe's efforts to establish that consent was not a defense in this case. For example, Doe brought a motion to exclude evidence of consent from the trial. But the Superior Court rejected that motion, reasoning that the criminal charges filed against the Officer did not specify that the sexual contact was "unwanted," and, unlike in the correctional facility context, there was no statute criminalizing officer-arrestee sexual interaction and implying that such sex was by law nonconsensual.[77]

At the prayer conference, Doe again argued that consent could not be a defense to allegations of assault or battery when a woman is in custody.[78] The State argued that whether consent was a defense as a matter of law had already been discussed in the context of Doe's failed motion,[79] that it would not "specifically argue consent" in its closing, and that consent remained a "fact question for the

_____

[76] App. to Opening Br. at 474 (Jury Instructions).
[77] Pretrial Conf. Tr. (Aug. 8, 2016), at 82:4–6, 82:17–20.
[78] Prayer Conf. Tr. (Jan. 19, 2017), at 32:18–19, 34:19–20.
[79] App. to Opening Br. at 212 (Motion to Bar Any Evidence, Claim or Argument that Plaintiff Consented to Sexual Contact with [the Officer]).

31

jury."[80]  The Superior Court rejected Doe's argument, declined to instruct the jury

that Doe was not in a position to consent, and allowed the consent issue to remain

embedded in the definitions of the torts Doe alleged the Officer had committed:

> **Tort of Assault:** Plaintiff alleges that [the] Officer . . . acted intentionally ***and without [her] consent***, to cause [her] to be in fear of an immediate harmful or offensive contact.
>
> **Tort of Battery:**  Plaintiff alleges that [the] Officer acted intentionally ***and without [her] consent***, to make contact in a harmful or offensive way.[81]

And, in its closing arguments at trial, the State argued that the jury should weigh the

Officer's version of events against Doe's and make its own decision about whether

or not the sex was consensual:

> You have heard the conflicting stories about what happened in the car. Unfortunately, both participants are deceased.  We would suggest . . . you listen . . . and consider that evidence as to what may or may not have happened in that car.[82]

The State did this, despite having charged the Officer with two crimes that both

depended on the State believing that Doe did not voluntarily perform the oral sex.[83]

After a three-day trial, the jury found that the State was not liable for the

Officer's sexual misconduct.[84]  Doe moved for a new trial, arguing the Superior

Court's jury instructions "were erroneous and undermined the jury's ability to

---

[80] Prayer Conf. Tr. (Jan. 19, 2017), at 34:1–10.
[81] App. to Opening Br. at 470–71 (Jury Instructions) (emphasis added).
[82] State's Closing Arg. Tr. (Jan. 19, 2017), at 4:13–18.
[83] App. to Opening Br. at 134 (Complaint and Warrant for [the Officer]).
[84] App. to Answering Br. at 179 (Jury Verdict Form).

intelligently reach a verdict."[85]  In response to Doe's motion for a new trial, the

Superior Court reviewed the Motivation Prong of its § 228 instruction again and

found that "[w]ere the Court to augment that language and add [the Officer's]

'specific conduct,' as suggested by Plaintiff, the result would be an importation of

the summary judgment inferences in *Doe* [*I*] into the trial setting . . . [and]

unnecessarily interpose the Court into the jury's determination of scope of

employment."[86]  And the Superior Court reaffirmed its decision not to deliver Doe's

proposed Foreseeability Prong for the § 228 instruction because it "failed to comply

with Delaware law and called for the Court to comment on the evidence."[87]

The Superior Court also reaffirmed its decision not to instruct the jury that

consent was not a defense in this case, reasoning that: because "[Doe's] and [the

Officer's] versions of the incident conflicted in several material aspects," it was

correct to "permit[] both parties to argue in their closing arguments their versions of

the events."[88]  Doe then appealed the Superior Court's ruling to this Court.

### F.     Current Appeal and Supplemental Briefing

On appeal, Doe argued that the jury's verdict should be reversed because the

instructions the jury received failed to give accurate guidance to enable it to make a

---

[85] *Sherman v. State*, C.A. No. N1-0C-08-178, at 2 (Del. Super. May 8, 2017).
[86] *Id.* at 11.
[87] *Id.* at 13.
[88] *Id.* at 13–14.

33

sensible case-specific determination of liability.  In particular, Doe contended that the Superior Court gave the jury no guidance as to how § 228's Motivation Prong was to be applied or as to whether general foreseeability was enough to satisfy § 228's Foreseeability Prong, and improperly allowed the jury to determine that Doe voluntarily consented to the oral sex.[89]

In pressing these points, Doe reiterated her view that: i) so long as the oral sex occurred during the period when the Officer was processing Doe's arrest, *Doe I* compelled a finding in her favor on § 228's Motivation Prong; ii) § 228's Foreseeability Prong required only general foreseeability of which there was unrebutted evidence; and iii) an arrestee may not consent to sex with an arresting officer under Delaware law, and thus consent could not be a valid defense.[90]  The State took the opposite position on all these points, and stressed that we had said in both *Doe I* and *Doe II* that the first two issues were ones for a jury to decide, that "any question of fact on the issue of consent was presented to the jury" by Doe not the State, and that Doe had received her day in court and the jury's finding against her should be respected.[91]  The argument that Doe made consent an issue, not the State, came with some ill grace.  Doe had argued that consent, by definition, could not be voluntary when given by an arrestee to her arresting officer.  The State

---

[89] Doe's Opening Br. at 6–7.
[90] *Id.* at 19–20, 24–25, 33–34.
[91] State's Answering Br. at 12, 21, 37.

opposed that position, and then despite charging the Officer with crimes involving non-voluntary sex,[92] insisted that the jury should decide whether Doe freely had sex with the Officer.

The oral arguments left us concerned that we had put the trial judge and the parties in an untenable position. Rather than hazard further confusion, we concluded that it would be wise to receive further input on two issues. The first was whether the trial court's inability to craft appropriately tailored jury instructions signaled a problem with our earlier rulings that might counsel departure from the law of the case. The other was whether the struggles the court and the parties were having with applying § 228's Motivation and Foreseeability Prongs related in part to using that section of the Restatement in a context where another related provision of the Restatement, § 219, had arguably more sensible application.

---

[92] One of our respected colleagues in dissent suggests that the State did not "by express terms charge that the sex occurred without [Doe's] consent." Dissent at 9 (Vaughn, J., dissenting). He is correct that the "express terms" of the State's charges (which included Sexual Exploitation) do not literally state that the coerced sex occurred without the victim's consent. But, as we will discuss later, sex "without consent," as defined by the section of our criminal law defining sex crimes, includes sex to which "the defendant compelled the victim to submit by any act of coercion as defined in § 791," and § 791 defines the crime of coercion to include the scenario in which a public servant uses or abuses their position "by performing some act within or related to the defendant's official duties, or by failing or refusing to perform an official duty in such manner as to affect some person adversely." 11 *Del. C.* §§ 761, 791. The State charged the Officer with committing Sexual Extortion by intentionally compelling or inducing Doe to engage in oral sex by instilling a fear in her that "if the sexual act [wa]s not performed," the Officer would have "take[n] the victim before the Court to appear on a capias." App. to Opening Br. at 134 (Complaint and Warrant for [the Officer]). Thus, in substance, the State charged the Officer with having threatened to "perform an official duty in such manner as to affect some person adversely" and thereby coercing oral sex from Doe. For this reason, under the State's Sexual Exploitation charge and § 761, the oral sex at issue here was by definition non-consensual. 11 *Del. C.* §§ 761, 791.

We did not do so lightly. But, when we pressed Doe's lawyer as to why he did not, for example, move for summary judgment again on the Motivation and Foreseeability Prongs on remand from *Doe II*, he argued that he already sought clarity in *Doe II* and had been rebuffed.[93] Upon our review of the record, we also realized that he had fairly argued § 219(2)(d) in *Doe I*,[94] and that we had ignored that argument.

We also took into account that, by failing to identify whether it was the wrongful conduct itself that had to be motivated in part by the Officer's desire to serve his employer to satisfy § 228's Motivation Prong, we left the Superior Court to hand to the jury a question of common law legal policy, not a case-specific question of fact. Not only that, by suggesting that the oral sex need not be motivated by a desire to serve the employer if it occurred during the course of "transporting a prisoner,"[95] we also risked confusing the proper inquiry under § 228's Motivation Prong in all kinds of cases, by importing into it ambiguities generated by *Doe I*'s legitimate concern over the serious nature of the police misconduct Doe alleged.

---

[93] Oral Argument at 1:39–2:25, *Sherman v. Dep't. of Pub. Safety* (No. 206, 2017), https://livestream.com/accounts/5969852/events/8066882/videos/170525984/player (Doe's Counsel: "The Court held that law of the case tracked back to [*Doe I*]. I was a little bit at a loss because I really thought it was a summary judgment case. . . . But be that as it may, we were dealing with law of the case, and I did not see that it would be appropriate to raise that issue again.").

[94] Doe's Opening Br. at 22, *Doe v. State*, 76 A.3d 774 (Del. 2013).

[95] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).

36

By widening our lens to consider § 219, which was designed to provide exceptions to § 228 by allowing a plaintiff's claims to bypass all of § 228's requirements when justified, we believed we would better position ourselves to give § 228 its most sensible interpretation. And in addition, give Doe a chance to be heard on her original argument that vulnerable arrestees should be able to obtain recovery without showing that the Officer's misconduct fell within the scope of his employment.

In response to our request for further briefing, Doe argued that the law of the case should give way here, that both § 219(2)(c) and (d) applied to the undisputed facts of this case, and that judgment should be entered in her favor on the issue of liability because, under Delaware law, an arrestee cannot voluntarily consent to sex with her arresting officer.[96]

For its part, the State argued that "[n]one of the exceptions to the law of the case apply," that the scope of employment issue cannot "be determined as a matter of law, even if [this Court] were to not follow law of the case," because Doe did not fairly present that issue to the trial court, and that we should decline to adopt § 219.[97] It also appears to adhere to its view that an arrestee like Doe could voluntarily consent to sex with her arresting officer.

---

[96] Doe's Supp. Br. at 5.
[97] State's Supp. Br. at 5, 7–8.

# III.     Analysis

We now wrestle with the issues on appeal in this order.  First, we grapple with the question of whether we should adhere to the law of the case and conclude that it is in the interests of justice to examine this case with a fresh eye.  Second, we address the specific issues that our prior opinions hedged.  Initially, whether the employee's wrongful conduct itself must be motivated in part by a desire to serve the employer to satisfy the Motivation Prong of § 228.  From there, we clarify whether general or specific foreseeability is required to satisfy § 228's Foreseeability Prong.  Then, we consider the relevance of § 219 and whether two of its subsections apply and relieve Doe of the obligation to show that the Officer's sexual misconduct fell within the scope of his employment under § 228.  Finally, we address the State's defense to liability that rests on the proposition that an arrestee may consent to sex with her arresting officer.

## A.     The Law of the Case Doctrine

We depart from the law of the case and decide important issues raised by this appeal with fresh eyes because the interests of justice require us to do so.[98]

We respect that the State argues that because "both parties tried this case according to the legal rule set down by the Court in *Doe I* and reaffirmed in *Doe II*,"

---

[98] *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000) (holding that the law of the case doctrine "is not an *absolute* bar to reconsideration of a prior decision . . . . [that] produces an injustice").

"it would not be unjust to the parties to allow this verdict to stand."[99] We acknowledge that this case has many years on it now, and we understand the State's legitimate concern about a late change in direction. But to the extent that *Doe I* established § 228's Motivation and Foreseeability Prongs as issues for the jury, that "law of the case" was only binding for so long as there were outstanding issues of fact related to those prongs. Although *Doe I* was correct that "the question of whether a tortfeasor is acting within the scope of his employment is fact-specific, and, ordinarily, is for the jury to decide,"[100] the question of whether tortious conduct falls within the scope of employment is "decided by the court if the answer is clearly indicated."[101]

The undisputed facts of this case turned the Motivation and Foreseeability Prongs into questions of law. Either it was the Officer's sexual misconduct or his arrest and transport of Doe that needed to be motivated in part by a desire to serve his employer. If the former, judgment should have been entered for the State on the issue of liability because Doe did not allege that the oral sex was so motivated. If

---

[99] State's Supp. Br. at 5.
[100] *Doe v. State*, 76 A.3d 774, 776 (Del. 2013).
[101] Restatement (Second) of Agency § 228 cmt. d (1958); *see generally Hyman Reiver & Co. v. Rose*, 147 A.2d 500, 503 (Del. 1958) ("[W]here the facts are such that reasonable minds can draw but one conclusion, it is the duty of the Court to decide the question and not to require the jury to deliberate upon evidence from which they can draw but one possible conclusion.") (citations omitted).

the latter, judgment on the Motivation Prong should have been entered in Doe's favor because the Officer was processing a valid arrest.

Likewise, the unresolved issue about foreseeability was one of law, not fact. If it was sufficient to satisfy § 228's Foreseeability Prong that it be foreseeable as a general matter that a police officer might misuse his authority to obtain sex from an arrestee, then judgment on the Foreseeability Prong was due to Doe because there was unrebutted evidence of general foreseeability of that kind. If, by contrast, Doe could only satisfy the Foreseeability Prong by showing that it was specifically foreseeable that the Officer posed a risk of sexual misconduct, then judgment on the Foreseeability Prong was owed to the State, as Doe produced no evidence that there were any warning signs that the Officer posed a specific risk of this kind.

The effects of this Court's error in remanding the Motivation and Foreseeability Prong issues under § 228 instead of answering them as a matter of law, and doing so without giving any guidance on how to tailor the required jury instructions, were compounded by the Superior Court's hesitation to edit the pattern § 228 instruction. The question presented to the jury failed to clarify whether the Motivation Prong applied to the Officer's wrongful conduct or the general course of conduct within which that wrongful act occurred. Likewise, the jury instruction did not clarify whether the Foreseeability Prong required officer-specific or general foreseeability. Without these clarifications, the Superior Court's instruction could

40

not "reasonably inform" the jury about the questions they were being asked to answer.[102]

Because we said in both *Doe I* and *Doe II* that these questions were ones for the jury, and gave no guidance as to how to resolve the legal issues underlying them, we do not fault the Superior Court for its reluctance to come down on one side of each of the issues, or its decision to give the jury instructions that simply parroted the terms of § 228.[103] But we did sense on the part of the Superior Court a broader disinclination to shape jury instructions involving standard provisions of law like § 228 into more case-specific instructions that focus the jury on what its role is in answering the relevant fact questions necessary to render a fair verdict in the case before it. And if that broader disinclination was the only basis for its reticence, we would be more willing to be critical, because jury instructions should be tailored to the specific dispute, a task that often requires the judge to isolate the fact questions that are relevant under the law to the actual case before the jury.[104] But here, the

---

[102] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).

[103] We note that the Superior Court erred in including § 228's first two prongs in its scope of employment instruction, despite the fact that *Doe I* already held that those prongs were satisfied as a matter of law. *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) ("[The Officer] was in uniform, on-duty, carrying out a police duty by transporting [Doe] to court. The sexual assault took place in the police car, during the time that [the Officer] was supposed to be carrying out police duties. These facts would satisfy the first two factors under the Restatement—[the Officer] was doing the kind of work he was employed to perform, and he was acting within authorized time and space limits.").

[104] *See Zimmerman v. State*, 565 A.2d 887, 890 (Del. 1989) ("The primary purpose of jury instructions is to define with substantial particularity the factual issues, and clearly to instruct the jury as to the principles of law which they are to apply in deciding the factual issues involved in the case before them."); *Herring v. State*, 805 A.2d 872, 876 (Del. 2002) ("Trial judges may

Superior Court's reticence was understandable, given that this Court failed on two occasions to provide any insight to help the trial court determine what was required to satisfy, as a matter of law, the Motivation and Foreseeability Prongs of § 228, and indicated that the jury was supposed to decide whether the State was liable based on hearing the evidence and being given the rote terms of § 228 in the form of a question.

Moreover, because of the ambiguity of *Doe I*, there is a possibility that failure to clarify in this appeal what the Motivation Prong means could have a negative effect on other cases involving § 228. By ignoring Doe's arguments regarding § 219 in *Doe I*, we left in place precedent rejecting a provision of the Restatement that is intended to provide exceptions to § 228, and to address difficult cases of this kind, and risked establishing an imbalanced approach to *respondeat superior* that could distort § 228's application in order to address inequities its rote application would have, if one proceeds under the assumption that § 228 should not give way when § 219 suggests it should.

Lastly, although cases like this are rare, that does not mean they are not important. For obvious reasons, scholars and commentators have long argued that

---

properly combine a statement regarding a fact in issue with a declaration of law."); 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2556 (2d ed. 1995) ("It is the inescapable duty of the trial judge to instruct jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search their truth.").

cases of this kind are underreported.[105]  It is important therefore for the principles of liability relevant to cases of this kind to be clear, and for victims to be assured that they can recover under *respondeat superior* if the principles of the Restatement support that result.

The question of whether the law of the case should be adhered to comes down to whether it is in the interests of justice to do so.  The unusual circumstances here lead us to conclude that the only way we can provide case-specific justice, and avoid confusion in other cases in the future, is to examine the issues before us with open minds.[106]

---

[105] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, EXECUTIVE GUIDE: ADDRESSING SEXUAL OFFENSES AND MISCONDUCT BY LAW ENFORCEMENT 4 (June 2011) ("Further complicating a full understanding of the scope of the [police sexual misconduct] problem is due in part to the reluctance of victims to report to authorities."); Peter B. Kraska & Victor E. Kappeler, *To Serve and Pursue: Exploring Police Sexual Violence Against Women*, 12 JUSTICE QUARTERLY 85, 92 (1995) ("Victims of sexual violence in general have few incentives to pursue a formal complaint, as well as many disincentives including the fear of being blamed for the incident and the fear of not being believed.  Not being believed and the fear of depersonalizing and humiliating institutional procedures and interpersonal hassles to which victims of sexual violence are frequently subject may be intensified when the offender is a police officer.  In short, the 'blue wall of silence' and the barriers to reporting combine to form a double bind of secrecy that makes data virtually unavailable to researchers."); Cara E. Trombadore, *Police Officer Sexual Misconduct: An Urgent Call to Action in a Context Disproportionately Threatening Women of Color*, 32 HARV. J. RACIAL & ETHNIC JUST. 153, 159 (2016) ("Despite the 'bad apple' trope used to distance law enforcement agencies from such officers, evidence suggests that this misconduct is not rooted in rogue individuals, but in systemic cultures of mismanagement and adherence to what some refer to as the 'blue wall of silence.'").

[106] One of our good friends in dissent is concerned that we are acting as a "superlegislature" and overstepping our bounds by reversing our prior precedents and establishing a new approach to our common law.  Dissent at 19 (Valihura, J., dissenting).  Our colleague would prefer that we commit to inertia, and impose upon our General Assembly to fix any problems in our prior rulings.  In cases involving statutory remedies, such as appraisal in corporate law or workers' compensation, we should of course be more reluctant to divert from prior interpretations of a statute, if that interpretation has been the subject of reliance for several years and the General Assembly has not

## B.       Section 228's Motivation Prong

The key legal issue in *Doe I* was whether it was the Officer's specific tortious conduct, the oral sex, or his general conduct, the arrest and transport, that needed to be motivated at least in part by a desire to serve his employer to satisfy § 228's Motivation Prong.  *Doe I*'s analogy to *Draper* did little to answer this doctrinal question because Doe never alleged that the Officer's sexual misconduct was even partially motivated by his desire to serve his employer.

As we have discussed, *Draper* is a mixed-motive case.  The defendant in *Draper* was charged with controlling the flow of traffic for his employer and stabbed a motorist intruding into the restricted area.[107]  In *Doe I* we stated that:

> [i]f the act of cutting someone's throat can be considered a service to the employer paving company on the theory that the employee was controlling traffic, then a sexual assault can be considered a service to the police on the theory that part of what [the Officer] was doing was transporting a prisoner.[108]

But that statement did more to obscure than to illuminate the key issue.  The fact that the Officer received oral sex during the same timeframe when he was processing

---

acted to override that interpretation.  But it is the duty of the courts to ensure that the common law is as fair and efficient as humanly possible, taking into account evolving societal conditions and the problems created by past rulings.  *See generally* OLIVER WENDELL HOLMES, THE COMMON LAW (1881).  We should not adhere to all past common law precedent until such time as the General Assembly enacts a statute overriding a judicial precedent addressing a subject traditionally governed by judicially-determined common law, especially given the General Assembly's reluctance to intrude in areas of law it has chosen to leave to the common law to address.

[107] *Draper*, 181 A.2d 567.

[108] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citations omitted).

Doe's arrest does nothing to address whether § 228's Motivation Prong applies to the specific wrongful act (*i.e.*, the receipt of oral sex) or the overall course of conduct within which the wrongful conduct occurred.

Upon close examination of the Restatement, it is apparent to us that § 228's Motivation Prong focuses on the wrongful conduct itself. Cases like *Draper* exist because the Restatement recognizes that there are situations where the wrongful conduct can have more than one motive, especially where the employee is charged with duties like security or law enforcement where some degree of force is often required to serve the employer faithfully.[109] To satisfy § 228's Motivation Prong, the allegedly tortious conduct must be "actuated, at least in part, by a purpose to serve the master."[110] The examples and discussion in the commentary to § 228 make

---

[109] Restatement (Second) of Agency § 245 cmt. a (1958) ("[T]he liability of the principal depends fundamentally upon the likelihood of a battery or other tort in view of the kind of result to be accomplished, the customs of the enterprise and the nature of the persons normally employed for doing the work. . . . [W]hether or not it is in the scope of the employment of a teller in a bank to interfere in a fight between two customers, it normally is within the scope of employment of an employee of a tavern to interfere in the fighting between two inebriates. In the latter case, as also where a custodian is protecting property, the master if responsible for the use of somewhat more than the appropriate amount of force.").
[110] *Id.* § 228(1)(c).

45

this clear.[111]  And other courts have found that police officers' sexual misconduct

does not satisfy the Motivation Prong of § 228 for this very reason.[112]

In this case, Doe never alleged that the Officer's misconduct was motivated

in any part by a desire to serve the State Police or the State.  Her complaint alleged

that the Officer sought oral sex solely to gratify himself.[113]  There was no question

[111] As the Restatement provides, "[t]o be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."  *Id.* § 228(2). Even authorized conduct must be done "in some part for the purpose of giving service to the master" to satisfy § 228's Motivation Prong.  *Id.* § 228 cmt. a.  And unauthorized conduct such as the sexual misconduct at issue here must be "subordinate to or pertinent to an act which the servant is employed to perform," and it still "must be within the ultimate objective of the principal" in order to fall within the scope of employment.  *Id.* § 229 cmt. b; *id.* § 245 cmt. f (an employer is only relieved from liability when "the servant has no intent to act on his master's behalf"); *see id.* § 229 cmt. a (comparing a situation where a janitor who is charged with preventing intrusions puts broken glass on a wall to prevent children from climbing it for the purpose of excluding them, and a situation where the janitor does so because he dislikes one of the children and wants to punish him, and finding that the former falls within the scope of employment and the latter does not, because the latter action was not motivated by an intent to serve the employer).

[112] *E.g.*, *Ho-Ching v. City & Cty. of Honolulu*, 2009 WL 1227871, at *13 (D. Haw. Apr. 29, 2009) (applying § 228 and its Motivation Prong and finding that "[i]f Moniz did commit a sexual assault or sexual harassment, it was not the conduct for which he was hired as a police office[r] and by no means served the interests of Defendant.  Thus . . . Moniz's actions . . . [were] clearly outside of the course and scope of his employment by HPD"); *Poehl v. Randolph*, 2006 WL 1236838, at *10 (E.D. Mo. May 3, 2006), *aff'd*, 276 Fed. Appx 540 (8th Cir. 2008) (applying a Missouri law similar to § 228 and finding that "[h]ere, the sexual misconduct that forms the basis of Plaintiff's allegations of assault and battery is not within the scope of employment of a police officer.  Further, Defendant Randolph's alleged sexual assault of Plaintiff was not based on an intent to perform Defendant City's business or further its purposes, but was instead done to fulfill his own personal purpose"); *see generally* Martha Chamallas, *Vicarious Liability in Torts: The Sex Exception*, 48 VAL. U. L. REV. 133, 146 (2013) ("Some courts have not been shy about expressing their 'sex is different' approach, flatly stating that sexual misconduct falls outside the course and scope of employment.  For these courts, the possibility that the employee was motivated by sexual desire, gratification, or lust marks it as qualitatively different from other tort cases, even other intentional tort cases.") (internal citations and quotations omitted).

[113] Although the facts of this case do not satisfy § 228's Motivation Prong, there arguably could be other fact patterns that present instances in which an employee's sexual assault was committed out of a desire to serve his employer.  Regrettably, there have been cases in which intelligence agencies, military officers, and police of certain regimes have used sexual assault and humiliation as interrogation tools to extract information for their employers' benefit.  *See, e.g.*, Int'l Criminal

of mixed motivation for the jury to resolve. If Doe was required to satisfy the Motivation Prong of § 228, she could not, and judgment was owed to the State on that ground. That reality underscores why Doe originally argued that § 219 relieved her of the need to satisfy § 228, and why we examine § 219's relevance in this decision.

## C.     Section 228's Foreseeability Prong

But before addressing § 219, we feel obligated to address the scope of the Foreseeability Prong, about which the parties have disagreed about throughout this case. From *Doe I* on, the parties have assumed that § 228's Foreseeability Prong, which requires that, "if force is used, the use of force is not unexpectable," applies to this case, likely because Doe's original complaint sued the State for the torts of assault and battery.[114] In *Doe I*, we held that foreseeability was a jury issue, while citing to cases for the proposition that "sexual assaults by police officers and others in positions of authority are foreseeable risks."[115]

As has been discussed, the parties disagree on what § 228's Foreseeability Prong requires in the context of police sexual misconduct. Consistent with other

---

Tribunal for the Former Yugoslavia: *Prosecutor v. Furundzija*, 38 I.L.M. 317 (1999), 351–52 ("Rape is resorted to either by the interrogator himself or by other persons associated with the interrogation of a detainee, as a means of punishing, intimidating, coercing or humiliating the victim, or obtaining information, or a confession, from the victim or a third person.").

[114] Compl. ¶ 9, *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012); Restatement (Second) of Agency § 228(1)(d) (1958).

[115] *Doe v. State*, 76 A.3d 774, 777 (Del. 2013) (citing *Red Elk v. United States*, 62 F.3d 1102 (8th Cir. 1995)).

courts' general discussions of foreseeability in the context of police officers' positions of authority, we find that Doe is correct in arguing that she is not required to show that it was foreseeable that the Officer posed a risk of committing sexual misconduct against an arrestee.[116] Instead, all Doe was required to show was that it was, as a general matter, foreseeable that police officers will misuse their authority to extract sexual favors from arrestees.

> Although cases like this are rare, that does not mean they are not foreseeable:
>
> > Cases like this stigmatize respected police officers who in rendering vital public work surely outnumber the errant officers. That does not mean, however, that in some circumstances, as in the present case, this type of sexual misconduct by an officer is not reasonably foreseeable for vicarious liability purposes.[117]

The reality is that there is no question of fact in this case that the Foreseeability Prong was satisfied. In defending against the State's initial motion for summary judgment and in later seeking summary judgment on the issue herself, Doe put in the summary judgment record evidence that "individual State Troopers commit[ted]

---

[116] Other jurisdictions have found police sexual misconduct foreseeable by an assessment of the general nature of the profession. *Red Elk on Behalf of Red Elk v. United States*, 62 F.3d 1102, 1107–08 (8th Cir. 1995) ("In our view it was also foreseeable that a male officer with authority to pick up a teenage girl out alone at night in violation of the curfew might be tempted to violate his trust. . . . For sexual misconduct on occasion by some officers not to be sufficiently foreseeable to impose vicarious liability would suggest that those in charge are blind to modern reality. It is neither so startling nor so unfair as to permit the government in these circumstances to escape liability."); *Mary M. v. City of L.A.*, 814 P.2d 1341, 1350 (Cal. 1991) ("The precise circumstances of the assault need not be anticipated, so long as the risk is one that is reasonably foreseeable. Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement, and thus liability for such acts may appropriately be imposed on the employing public entity.").
[117] *Red Elk*, 62 F.3d 1107.

unauthorized and wrongful acts during execution of their duties, including one rape, and multiple assaults," and that "in 1995 a Lewes police officer pled guilty to on duty unlawful sexual intercourse with a woman in custody."[118]  And former Delaware State Police Superintendent Thomas MacLeish acknowledged that "there is a risk in police work that a small minority of police officers will engage in sexual assault or similar misconduct involving detainees in their custody."[119]

That the State Police provides its officers training on this issue is admirable,[120] and unsurprising given the abundant academic, professional, and news sources documenting the foreseeability of this risk,[121] and the likelihood that the

---

[118] Doe's 2014 Motion for Summary Judgment (citations omitted), at Exs. E, F; Doe's Response to the State's 2012 Motion for Summary Judgment, at Exs. B, B-1.  One of our dissenting friends notes that this evidence was not in the trial record.  Dissent at 5 (Vaughn, J., dissenting).  But it was in the record on both the State's 2012 motion for summary judgment, and Doe's 2014 motion for summary judgment on the issue of liability, in which Doe argued that foreseeability was established as a matter of law, and was denied a favorable ruling despite the absence of countervailing evidence.

[119] Doe's 2014 Motion for Summary Judgment, at 4–5.

[120] *E.g.*, App. to Opening Br. at 384 (Colonel MacLeish Testimony Tr.) (Q: "Is it ever made known to people when they are hired by the Delaware State Police that . . . no officer is supposed to ever cross the line and sexually assault or abuse someone in their custody?"  A: "Our process, part of the training, ongoing training that takes place in the academy, there is an interaction with public and individuals and the proper manner in which you do so.  You are told whenever you transport a person of the opposite sex, to call in your mileage.  So your mileage is recorded, and typically, that is one of those things that is shared, the reason why you do not cross those lines.").

[121] Associated Press, *Hundreds of Officers Lose Licenses Over Sex Misconduct* (Nov. 1, 2015), https://apnews.com/fd1d4d05e561462a85abe50e7eaed4ec (reviewing police department records in 41 states and finding that "about 1,000 officers . . . lost their badges [between 2009 and 2014] for rape, sodomy and other sexual assault; sex crimes that included possession of child pornography; or sexual misconduct such as propositioning citizens or having consensual but prohibited on-duty intercourse."); Buffalo News, *Abusing the Law*, http://projects.buffalonews.com/abusing-the-law/data.html (2016) (database of over "700 credible cases of sexual misconduct from law enforcement personnel over a 10-year period"); PHILIP M. STINSON ET AL., POLICE SEXUAL MISCONDUCT: A NATIONAL SCALE STUDY OF ARRESTED

phenomenon is underreported.[122]   The documented nature of this risk is also exemplified by a lengthy monograph published by the International Association of Chiefs of Police, which provides information and materials to help police chiefs implement training and suggests policies to address the problem.[123]   As that report summarized:

> Within the policing profession some conditions of the job may inadvertently create opportunities for sexual misconduct.   Law enforcement officers (1) have power and authority over others; (2) work independently; (3) sometimes function without direct supervision; (4) often work late into the night when their conduct is less in the public eye; and (5) engage with vulnerable populations who lack power and are often perceived as less credible (*e.g.*, juveniles, crime victims, undocumented people, and those with addictions and mental illness).[124]

---

OFFICERS (Bowling Green State Univ., Crim. Just. Faculty Pub.) (2014) (analyzing 548 cases that resulted in the officer's arrest for sex-related crimes between 2005 and 2007); Peter B. Kraska & Victor E. Kappeler, *To Serve and Pursue: Exploring Police Sexual Violence Against Women*, 12 JUSTICE QUARTERLY 85, 103 (1995) ("We found an obvious pattern when reviewing the rape cases cited here.  The incidents resemble the [scenario whereby a police officer] pulls over a female citizen for some traffic violation (generally driving under the influence), threatens her with arrest, and takes her to a secluded location for some outwardly legitimate reason [and then] the police officer rapes the victim.").

[122] *See* the sources cited in note 105.

[123] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, EXECUTIVE GUIDE: ADDRESSING SEXUAL OFFENSES AND MISCONDUCT BY LAW ENFORCEMENT 6 (June 2011) ("Law enforcement leaders should directly address the problem of sexual misconduct by instituting a zero-tolerance standard and demonstrating that allegations will be promptly and thoroughly investigated.  Any meaningful policy addressing sexual misconduct and offenses should state that an abuse of authority is grounds for disciplinary action, up to and including termination.  In keeping with efforts undertaken by the corrections field, local law enforcement executives should establish an agency wide culture of accountability and seek commitments from key stakeholders, including their governing body, police unions and their members, to support this standard.").

[124] *Id.* at 4; *see also* PHILIP M. STINSON ET AL., POLICE SEXUAL MISCONDUCT: A NATIONAL SCALE STUDY OF ARRESTED OFFICERS (Bowling Green State Univ., Crim. Just. Faculty Pub.) (2014), at 2 ("Police work is conducive to sexual misconduct.  The job affords unique opportunities for rogue police officers to engage in acts of sexual deviance and crimes against citizens they encounter.").

In cases like Doe's, the plaintiff has no obligation to go further than pointing to undisputed evidence of this kind that the sexual misconduct was generally foreseeable. Evidence that the particular officer in question was known to have a proclivity for sexual misconduct might bear importantly on a case accusing the employing police agency of engaging in fault-based conduct of its own, but it is not necessary to satisfy § 228's Foreseeability Prong.

Because in this case the State did not and could not identify a material dispute of fact that there was general foreseeability of the kind required by the Foreseeability Prong of § 228, Doe was entitled to a ruling in her favor on this issue as a matter of law. As we next explain, Doe did not need to satisfy any of the elements of § 228 in order to recover against the State. But, we feared that the ambiguity of the rulings in this case on the scope of § 228's Foreseeability Prong could cause confusion in future cases, and that it was therefore in the interests of justice to provide clarity on the issue.

### D.        Section 219's Exceptions to § 228

In its original dismissal of the case, the Superior Court considered the application of § 219 and concluded that "there are no Delaware cases of which the Court is aware that adopt § 219 of the Restatement (Second) of Agency as the law of Delaware."[125]  But § 219 "enumerates the situations in which a master may be

---

[125] *Doe v. Giddings*, 2012 WL 1664234, at *4 (Del. Super. May 7, 2012).

51

liable for torts of servants acting solely for their own purposes and hence not in the scope of employment,"[126] it is referenced as a companion provision in § 228,[127] and when embracing the Restatement, this Court should be inclined to embrace its relevant provisions in their entirety and not cherry-pick isolated sections.

Section 219 exists precisely because there are situations when it would be inequitable to deny a tort victim a recovery against the tortfeasor's employer, even if the provisions of § 228 would not allow her recovery. Indeed, § 219's existence underscores why this Court has struggled with this case. However ambiguous *Doe I* was in articulating a mandate for the Superior Court to follow, *Doe I*'s equitable foundation is consistent with our recognition of § 219. Although *Doe I* was terse, it is obvious that the Court was rightly concerned about allowing the State to escape liability when one of its police officers, in the course of making and processing a valid arrest, misused his legal authority over an arrestee to coerce her into performing sexual acts on him in order to escape spending time in jail.

Other courts have found that two of § 219's exceptions operate to address this concern: § 219(2)(d), which provides for *respondeat superior* liability outside the scope of employment when the tortfeasor was "aided in accomplishing the tort by

---

[126] Restatement (Second) of Agency § 219 cmt. e (1958).
[127] *Id.* § 228 cmt. a ("In addition, a master may be liable if a servant speaks or acts, purporting to do so on behalf of his principal, and there is reliance upon his apparent authority or he is aided in accomplishing the tort by the existence of the agency relation. See Comment *e* on § 219 for illustrations.").

the existence of the agency relation,"[128] and § 219(2)(c), which does the same for situations in which the employer owed a "non-delegable duty" to the tortfeasor's victim.[129] We agree with those courts, and Doe, in viewing these exceptions as applicable to this case and relieving Doe of the obligation to satisfy the requirements of § 228.[130] We begin with § 219(2)(d).

---

[128] Restatement (Second) of Agency § 219(2)(d) (1958); *Doe v. Forrest*, 853 A.2d 48 (Vt. 2004).

[129] Restatement (Second) of Agency § 219(2)(c) (1958); *Cox v. Evansville Police Dep't*, 84 N.E.3d 678 (Ind. Ct. App. 2017). Although *Cox* does not directly cite to § 219(2)(c), it still applies the exception through reference to Illinois precedent recognizing the non-delegable duty exception to *respondeat superior*'s scope of employment requirement under the Restatement (Second) of Agency. *Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 250 (Ind. 1989) (holding that "[w]here an employer has assumed a non-delegable duty [under § 214 of the Restatement (Second) of Agency (1958)] to protect a person and his employee inflicts injury on that person, the doctrine of *respondeat superior* will not interdict the imposition of liability on the employer even if the wrongful act was outside the scope of employment.").

[130] In its supplemental briefing, the State argues that this Court should not apply § 219 because the Restatement (Third) of Agency "does not contain the provisions of Restatement (Second) of Agency 219," and that instead we should apply the Restatement (Third)'s test for scope of employment:

> An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct that is subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

State's Supp. Br. at 16; Restatement (Third) of Agency § 7.07 (2006). But we decline to apply the Restatement (Third) here because our State has embraced the Restatement (Second) of Agency, and § 228 in particular, for decades now, and the § 228 test works well to fairly determine when *respondeat superior* liability is appropriate. *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200 (Del. 2015); *Wilson v. Joma, Inc.*, 537 A.2d 187 (Del. 1988); *Coates v. Murphy*, 270 A.2d 527 (Del. 1970). We are therefore reluctant to abandon it. We also note that the Restatement (Third)'s Reporter's Notes indicate that jurisdictions "are not in accord on the appropriate standard for vicarious liability when an employee commits an intentional tort involving sexual misconduct in connection with the employee's work," and that some "cases [continue to] analyze employee sexual misconduct using a standard based on [the Restatement (Second) of Agency § 219(2)(d)]." Restatement (Third) of Agency § 7.05 Reporter's Note e (2006). Not only that, but we also note that the Restatement (Third) appears to otherwise recognize the continuing vitality of § 219(2)(c) and (d) and that the theories underlying them are embedded in the broader treatment of apparent

### i. Section 219(2)(d)

Here, it is plain to us that the Officer was "aided in accomplishing the tort by the existence of the agency relation."[131]  According to Doe's testimony, the Officer told her that if she performed oral sex on him, he would release her.  But if she failed to comply, the Officer would make her spend the weekend in jail.[132]  From the standpoint of an ordinary person, this threat would have real force.  But the force of that threat is not dependent on a belief that the Officer had the actual authority to demand sex for favorable treatment, as the State suggested it must be, to trigger liability under *respondeat superior*.[133]

---

authority under the Restatement (Third).  *Id.* § 7.08 ("Section 219(2)(d) concludes with a further general basis for an employer's vicarious liability, which is whether an employee 'was aided in accomplishing the tort by the existence of the agency relation.'  This Restatement does not include 'aided in accomplishing' as a distinct basis for an employer's (or principal's) vicarious liability.  The purposes likely intended to be met by the 'aided in accomplishing' basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents.  *See* § 7.05."); *id.* ("A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."); *id.* § 7.05 Reporter's Note b ("Apparent authority rarely serves as a basis for liability when an employee or agent commits an intentional physical tort.  One formal possibility is suggested by Restatement Second, Agency § 219(2)(d), which provides that '[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: . . . the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.'"); *id.* § 7.06 ("A principal required . . . by law to protect another cannot avoid liability by delegating performance of the duty, whether or not the delegate is an agent.").

[131] Restatement (Second) of Agency § 219(2)(d) (1958).

[132] Compl. ¶ 7, *Doe v. Giddings*, 2012 WL 1664234 (Del. Super. May 7, 2012).

[133] *See, e.g.*, State's Answering Br. at 7, *Doe v. State*, 76 A.3d 774 (Del. 2013) (arguing that the first prong of § 228 (that the conduct needed to be of the kind the Officer was employed to perform) could not be satisfied by the facts of this case because "Doe testified that [the Officer] was arrested because 'he did something he wasn't supposed to do.'  Doe further testified that she knew the

Rather, that threat would have real force for a more mundane reason: police officers have considerable discretion in determining how strict to be in seeking high bail or other conditions of release,[134] and in many cases, releasing a defendant on a summons.[135] Someone in Doe's position would rightly fear that if she refused the Officer, he would seek to put her in jail. And if she attempted to tell the magistrate what he did, she might fear that she would be disbelieved by a magistrate who may have dealt with the Officer in other cases, and perhaps get even worse treatment for appearing to have falsely accused a member of law enforcement of wrongdoing. Fear of that kind would be reasonable, as someone in Doe's position would assume the Officer would lie to the court. The record here illustrates how rational a fear of that kind would be, because the Officer denied that the oral sex occurred when first confronted with Doe's complaint,[136] and only admitted it when he was later

---

police officer had to take her to Court on her outstanding *capias*. Doe also testified that she knew the officer was breaking the law when he asked her to engage in oral sex.").

[134] *E.g.*, STATE OF DELAWARE JUSTICE OF THE PEACE COURTS, LEGAL MEMORANDUM NO. 11-294: BAIL PROCEDURES & GUIDELINES 15–16 (Nov. 18, 2011) ("A justice of the peace may consider factors such as . . . a police officer's verbal statement to the Court, as aggravating or mitigating factors when making the decision on the amount of bail."); *id.* at 10 (stating that, when evaluating whether the accused presents a flight risk, the magistrate can consider whether the accused "indicated to police that he or she will not appear as directed").

[135] Here, because Doe had an outstanding *capias*, the Officer did not have that option under State Police policy.

[136] App. to Opening Br. at 100 (Interview of [the Officer]) ("Q. [H]er allegation is that she performed oral sex on you in your police car in the front seat . . . . A. No.").

confronted with physical evidence of the oral sex.[137]  Absent the oral sex occurring,

that evidence does not exist and is unavailable to an arrestee who refuses.

For reasons like this, courts in other jurisdictions have held that § 219(2)(d)

applies when an employee misuses his authority to obtain sex.[138]  Or, as the Vermont

Supreme Court held: § 219(2)(d) applies when a "plaintiff can show that an on-duty

law enforcement officer was aided in accomplishing an intentional tort involving a

---

[137] *Id.* at 60 (Interview of [Doe]) ("A. But when he made me do what I did . . . [,] I made sure he squirted all in my jacket."); App. to Opening Br. at 120 (Second Interview of [the Officer]) ("I didn't tell her I was going to do anything for her . . . .  She just started coming on to me. . . [and] I made the mistake of engaging into it.").

[138] For cases in which courts have used the principles of authority underlying § 219(2)(d) to hold employing police agencies liable for their officers' sexual misconduct, *see White v. Cty. of Orange*, 212 Cal. Rptr. 493, 496 (Ct. App. 1985) (asking whether a County was liable for its police officer's sexual assault of a detainee and finding that "[t]he use of authority is incidental to the duties of a police officer.  The County enjoys tremendous benefits from the public's respect for that authority.  Therefore, it must suffer the consequences when the authority is abused"); *Mary M. v. City of L.A.*, 814 P.2d 1341, 1352 (Cal. 1991) ("Our society has entrusted police officers with enforcing its laws and ensuring the safety of the lives and property of its members.  In carrying out these important responsibilities, the police act with the authority of the state.  When police officers on duty misuse that formidable power to commit sexual assaults, the public employer must be held accountable for their actions."); *Applewhite v. City of Baton Rouge*, 380 So.2d 119, 122 (La. Ct. App. 1979) (finding a city–defendant liable for its police officer's sexual assault of a detainee because "where it is found that a law enforcement officer has abused the 'apparent authority' given such persons to act in the public interest, their employers have been required to respond in damages.  This is particularly true where, as here, the officer is on duty"); *see also Costos v. Coconut Island Corp.*, 137 F.3d 46, 50 (1st Cir. 1998) ("[D]efendants are well within the scope of § 219(2)(d) liability.  By virtue of his agency relationship with the defendants, as manager of the inn, Bonney was entrusted with the keys to the rooms, including Costos' room, at the Bernard House.  Because he was the manager of the inn, Bonney knew exactly where to find Costos.  The jury could find that Bonney had responsibilities to be at the inn or to have others there late at night.  In short, because he was the defendants' agent, Bonney knew that Costos was staying at the Bernard House, he was able to find Costos' room late at night, he had the key to the room and used the key to unlock the door, slip into bed beside her as she slept, and rape her.").

sexual assault on the plaintiff by the existence of the employment relationship with the law enforcement agency."[139]

The policy basis for doing so was well stated by the United States Court of Appeals for the Seventh Circuit in *Norris v. Waymire*, a case decided under 42 U.S.C. § 1983: When an officer takes "advantage of the opportunity that [his] authority and proximity and privacy give him to extract sexual favors," that behavior "should be sufficiently within the orbit of his employer-conferred powers to bring the doctrine of *respondeat superior* into play, even though he is not acting to further the employer's goals but instead is on a frolic of his own."[140]

Cases like *Waymire* recognize that police officers with arrest authority have a coercive power that distinguishes them from most employees, as those they arrest are required to comply and cannot resist, even peaceably, their authority. Here, for example, there is no question that the Officer was aided in accomplishing the sexual misconduct by his position of authority, because "the wrongful acts flowed from the very exercise of this authority."[141] Had he not been "in uniform, in a marked patrol vehicle" and effectuating an arrest, Doe "would not have stopped at his direction and the events that followed would not have occurred."[142]

---

[139] *Doe v. Forrest*, 853 A.2d 48, 67 (Vt. 2004).
[140] *W. By & Through Norris v. Waymire*, 114 F.3d 646, 649, 652 (7th Cir. 1997) (internal citations omitted) (emphasis added) (but finding that "the doctrine of *respondeat superior* is not available to a plaintiff in a section 1983 suit").
[141] *White v. Cty. of Orange*, 166 Cal. App. 3d 566, 571 (Ct. App. 1985).
[142] *Id.*

In finding that § 219(2)(d) applies to this case, we take into account the critical difference between police officers who act to arrest people and employees of most businesses. However important plumbers, electricians, accountants, and myriad other providers of services are to their customers, none of them wield the potent coercive power entrusted to our police under our laws.[143] None of these employees have the presumptive legal authority to deprive a person of her liberty and subject her to a period of incarceration. By contrast, that is the authority our police officers possess, which is enforced by criminal laws punishing arrestees for resisting any exercise of their authority.

Arrestees are by definition required to surrender their control and autonomy to the State upon their arrest. The Delaware Criminal Code "gives no right to resist an arrest by a police officer, whether or not the arrest was lawful and whether or not the accused knew the arrester was a police officer."[144] In fact, it is a class G felony to resist arrest with force or violence, and a class A misdemeanor to peacefully resist arrest.[145]

---

[143] *See Doe v. City of Chi.*, 360 F.3d 667, 671 (7th Cir. 2004) ("The situation of a police officer, however, is significantly different from that of a meter reader. The officer is armed, has authority to arrest that is considerably broader than the authority of a private person to make a 'citizen's arrest,' has access to all sorts of personal information, is an authority figure trained to develop and project an intimidating aura, and may seem to be above the law ('I am 911').").
[144] *Newman v. State*, 942 A.2d 588, 592 (Del. 2008) (quoting Delaware Criminal Code with Commentary § 1257 (1973)).
[145] 11 *Del. C.* § 1257(b).

The State argues that § 219(2)(d) only applies to situations in which the tortfeasor exercises apparent authority and tricks the victim into believing he has been authorized by his employer to commit the tort itself.[146] But the Supreme Court of the United States has rejected the argument that § 219(2)(d) only applies in situations involving apparent authority, reasoning that such an interpretation "would render the second qualification of § 219(2)(d) almost entirely superfluous . . . . The illustrations accompanying this subsection make clear that it covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship."[147]

> The Vermont Supreme Court dismissed a similar argument:
>
> Although one of the hypotheticals in the comment involves misrepresentation or deceit, the other does not, and the comment does not limit the reach of the section language in this respect. Indeed, the comment specifically states that the "enumeration of such situations is not exhaustive."[148]

And the New Mexico Supreme Court adopted § 219(2)(d)'s provision for liability when an employee is "aided by his status . . . in committing his alleged torts."[149]

---

[146] State's Supp. Br. at 14.

[147] *Faragher v. City of Boca Raton*, 524 U.S. 775, 802 (1998).

[148] *Doe v. Forrest*, 853 A.2d 48, 64–65 (Vt. 2004) (quoting Restatement (Second) of Agency § 219, cmt. e (1958)).

[149] *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 71 (N.M. 2004) (adopting § 219(2)(d) and holding that "the question that we must decide is whether Ocana presented sufficient evidence showing that Kaminski was aided by his status as her supervisor in committing his alleged torts"); *Spurlock v. Townes*, 368 P.3d 1213, 1217 (N.M. 2016) ("While *Ocana* involved an employee's claims of sexual harassment by her supervisor, we adopted the aided-in-agency theory in our consideration

Here, there is no dispute that the Officer was "aided . . . by the existence of the agency relation" in victimizing Doe.[150]

### ii.       Section 219(2)(c)

For reasons similar to why we find § 219(2)(d) applicable to this case, we also find that the State cannot escape responsibility for the Officer's conduct under § 219(2)(c), which provides an exception to the scope of employment requirement in cases where the employee's "conduct violated a non-delegable duty of the master."[151]  Because under Delaware law it is crime to resist arrest, even peaceably, the arrestee has no option but to remain under the arresting officer's domain and is subject to criminal punishment for taking any action to escape or resist.  And the State can be liable "because of [its] duty to protect [the arrestee]," even if the employee "commits an assault or battery in a spirit of play or wholly by way of revenge or other personal motive."[152]

When the State authorizes police officers to take away the liberty of arrestees, it cannot delegate away its own responsibility to make sure that an arrestee is not harmed by the tortious conduct of its arresting officers.  Even more than common carriers who cannot delegate away the duty of care they owe their passengers and

---

of the plaintiff's common-law claims for the intentional torts of assault, battery, and intentional infliction of emotional distress, and we did not limit the rule to the sexual harassment context.").
[150] Restatement (Second) of Agency § 219(2)(d) (1958).
[151] *Id.* § 219(2)(c).
[152] *Id.* § 245 cmt. g.

cargo,[153] governmental authorities who give police officers the power to deprive arrestees of their liberty are fairly held to account if their own officers abuse their official authority and commit an intentional tort on an arrestee. For this reason, the Indiana Court of Appeals has held an employer liable for an arresting officer's tortious sexual misconduct, finding that a non-delegable duty exists as a "matter of law" when "patrons must surrender their control and autonomy to the entity while they are in its care."[154] Because an arrestee is "wholly dependent on [her arresting] officer for her safety and survival and ha[s] no ability to control her environment or protect herself from harm," we find that the logic behind the § 219(2)(c)'s non-delegable duty exception to *respondeat superior*'s scope of employment requirement is applicable under Delaware law.[155]

---

[153] Delaware has long-recognized "common carrier" exception to the scope of employment requirement. *E.g.*, *Pennewill v. Cullen*, 1849 WL 713 (Del. Super. Oct. 1849). A common carrier offers "transport to freight or passengers for a fee" and in doing so undertakes a special non-delegable duty to ensure its cargo safe passage. Common Carrier, Black's Law Dictionary (10th ed. 2014). And "[t]he liability of a common carrier is that of an insurer against every thing except inevitable accident, usually called the act of God; public enemies, and the plaintiff's own default." *Pennewill*, 1849 WL 713, at *3.

[154] *Cox v. Evansville Police Dep't*, 84 N.E.3d 678, 687 (Ind. Ct. App. 2017); *id.* at 690 ("[The arrestee] was under arrest. She was also extremely intoxicated, to a point that she was slipping in and out of consciousness and the hospital was reluctant to discharge her. [The] Officer [] was ostensibly transporting her to lockup for six hours of medical observation, and she was barefoot and in handcuffs in the back of his marked police vehicle when he pulled her out to rape her. She was quite clearly wholly dependent on the officer for her safety and survival and had no ability to control her environment or protect herself from harm. Under these circumstances, we have little difficulty concluding that, at the time of the sexual assault, [the arrestee] had surrendered her control and autonomy to [the] Officer []. Consequently, as a matter of law, Fort Wayne owed a non-delegable duty of care to [the arrestee].").

[155] *Id.*

For these reasons, we therefore find that on the undisputed facts of record, both § 219(2)(c) and (d) applied to relieve Doe of the obligation to satisfy the requirements of § 228.

＊ ＊ ＊ ＊

The State argues that if we give effect to § 219, we are fundamentally altering the law of *respondeat superior* and holding employers responsible in strict liability, and not for a fault-based tort.[156] This argument is unconvincing and based on a misunderstanding of general principles of *respondeat superior* liability.

In most cases where employers are held responsible for a tort committed by an employee under § 228, there is no inquiry into whether the employer itself has acted with negligence or some worse level of conduct. Instead, the focus in terms of the level of care is on the employee and if the employee has committed a tort, say involving negligence, then the question is whether the employer should also be liable because the employee's conduct occurred on the job.[157] For example, if a UPS driver

---

[156] State's Supp. Br. at 10 (arguing that applying § 219's exceptions to the scope of employment requirement in cases like this one "would impose some form of strict liability against local or state police departments").

[157] *Compare* Restatement (Second) of Agency § 213 (describing factors for assessing whether an *employer's conduct* was negligent or reckless and should result in *direct* liability) *with id.* § 228 (1) (describing factors for assessing whether an *employee's conduct* should result in *vicarious* liability for the employer).

delivering a Christmas gift is at fault in a fender-bender, UPS is liable under *respondeat superior*, without any inquiry into its fault.

We also disagree with the State that by adopting § 219, we are somehow choosing to forsake § 228 for another framework. The authors of the Restatement envisioned that § 228 and § 219 would operate in tandem.[158] As this case and other decisions illustrate, ignoring § 219 and putting all the weight on § 228 can give rise to the temptation to misinterpret § 228 to deal with cases when allowing the employer to escape *respondeat superior* liability would otherwise be inequitable.[159]

---

[158] Restatement (Second) of Agency § 228 cmt. a (1958) ("In addition, a master may be liable if a servant speaks or acts, purporting to do so on behalf of his principal, and there is reliance upon his apparent authority or he is aided in accomplishing the tort by the existence of the agency relation. See Comment *e* on § 219 for illustrations."); *id.* § 219 cmt. e (Section 219 "enumerates the situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment").

[159] The concern we have with using § 228 in isolation from § 219 is illustrated by certain cases in which courts find police departments liable in sexual assault cases, but do so by reading § 228 or an equivalent scope-of-employment test elastically, particularly their Motivation Prongs, rather than by use of an exception to that test. *E.g.*, *Doe v. Clavijo*, 72 F. Supp. 3d 910, 915 (N.D. Ill. 2014) (purporting to apply § 228's Motivation Prong where there was no evidence that the sex was motivated by a desire to serve the police officer's employer, but still finding that "[a] reasonable jury could conclude from the allegations in the complaint that the Defendant Officers were acting within the scope of their employment when they sexually assaulted Plaintiff. The Defendant Officers were on duty, sitting in their police car, wearing their uniforms, and carrying their weapons. Further, Plaintiff alleges that she would not have walked over to the Defendant Officers when they gestured to her, nor would she have gotten into their car, if they were not police officers"); *St. John v. United States*, 240 F.3d 671, 677–78 (8th Cir. 2001) (applying South Dakota law and acknowledging that "[g]enerally, the act of an employee done to effect some independent purpose of his own is not within the scope of his employment [under Restatement (Second) of Agency § 229]" but still finding that an officer's sexual assault could have fallen within the scope of employment if he threatened her with an arrest to coerce her into the sex because "[o]nly a police officer would have the ability to utilize the threat of arrest to coerce a civilian into unwillingly accompanying him. . . . [T]he effectiveness of Coleman's threat to arrest St. John depended entirely upon his ability to fulfill it—an ability within the foreseeable scope of his employment"); *Carney v. White*, 843 F. Supp. 462, 479–80 (E.D. Wis. 1994), *aff'd sub nom. Carney v. Vill. of Darien*, 60 F.3d 1273 (7th Cir. 1995) (purporting to apply § 228's Motivation

By using the Restatement as intended, and employing § 219 in tandem with § 228, there is no need to twist the words of § 228 to avoid inequity.

## E.     Consent Not a Defense

We reach the last contested issue on appeal. As we have noted, when the Officer was originally confronted with Doe's complaint, he denied that there was any sexual contact between them. It was only when he was confronted with the existence of DNA evidence that he changed his story, which then became that Doe somehow became amorous with him during the course of the arrest and that he succumbed to her desire for him. That the State disbelieved the Officer is, Doe argues, demonstrated by the fact that it charged him with Sexual Extortion.[160] That crime has elements that are inconsistent with the Officer's version of events: the Officer must have intentionally compelled Doe to give him oral sex by "instilling in [her] a fear that if the sexual act [was] not performed" he would take her to court and

Prong where there was no evidence that the sex was motivated by a desire to serve the police officer's employer, but still finding there was a "genuine dispute as to" whether the officer's sexual assault of an arrestee fell within the scope of his employment because the officer accomplished the assault "because of his position as [a] police officer and the attendant power such a position carries"); *see also Fearing v. Bucher*, 977 P.2d 1163, 1166–67 (Or. 1999) (purporting to apply § 228's Motivation Prong, but still finding that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve Bucher's performance of the ordinary and authorized duties of a priest. . . . [T]he jury also could infer that, in cultivating a relationship with plaintiff and his family, Bucher, at least initially, was motivated by a desire to fulfill his priestly duties and that, over time, his motives became mixed"). To our mind, it is preferable not to succumb to the natural equitable tug of cases like these in order to read § 228 as giving rise to *respondeat superior* liability, but thereby giving an interpretation to § 228 that is at odds with its plain meaning and the official commentary, and also makes it difficult to apply in other contexts.

[160] App. to Opening Br. at 134 (Complaint and Warrant for [the Officer]).

64

she would spend the weekend in jail.[161]  The other crime that the State charged the

Officer with, Receiving a Bribe, is also inconsistent with the State's contention that

the oral sex was freely given.  Under that charge, the State sought to hold the Officer

criminally liable for "solicit[ing] a personal benefit from another person for having

violated his duty" to bring Doe in on her *capias*.[162]

By the time of trial, the Officer was dead and the State's only evidence in

support of its consent defense was the Officer's second statement.  Because Doe was

also deceased, she was not available to testify in person at trial either.  On this record,

and in the face of its inconsistent criminal charges against the officer, the State

insisted on preserving the defense that Doe could have voluntarily consented to the

oral sex, and that if she did, the State was not liable.[163]  And the Superior Court

rejected Doe's argument that an arrestee could not consent to sex with her arresting

officer and instead instructed the jury on assault and battery in such a way that

whether the sex was consensual was an issue for "the jury to figure out."[164]

We do not agree with the State that, under Delaware law, an arrestee can give

voluntary consent to sex with her arresting officer when she is under arrest.  Because

---

[161] *Id.*

[162] *Id.*  The State also charged the Officer with Official Misconduct for failing to take Doe in on an active *capias*.  *Id.*

[163] Pretrial Conf. Tr. (Aug. 8, 2016), at 79:1–4 ("There's not a specific statute that governs the situation that says, as a matter of law, consent is not a defense.  So, absent that statute, we think the general consent instruction should apply.").

[164] *Id.* at 83:6–7.

65

an arrestee has no right to resist arrest in any manner and because an arresting officer has discretionary authority that, if used to that effect, can subject an arrestee to time in jail, the power dynamic between the arresting officer and arrestee is too imbalanced to allow for voluntary consent. Because of this power imbalance, the Model Penal Code states that sexual conduct with another person when "the other person is in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over him" constitutes sexual assault.[165]

Although Delaware has not adopted that provision of the Model Penal Code, our Criminal Code does define a sexual act "without consent" as occurring when "[t]he defendant compelled the victim to submit by any act of coercion,"[166] defined to include threatening to "[u]se or abuse the defendant's position as a public servant by performing some act within or related to the defendant's official duties, or by failing or refusing to perform an official duty in such manner as to affect some person adversely" if someone does not comply with a demand.[167]

The policy rationale for barring consent as a defense to allegations of sexual misconduct against a police officer is similar to that for criminalizing sex between an inmate and a corrections officer:

> The reason why the federal government and almost every state has laws banning even ostensibly voluntary sexual contact between inmates and

---

[165] Model Penal Code § 213.4.
[166] 11 *Del. C.* § 761.
[167] *Id.* § 791.

66

prison staff is that prisoners are deemed legally incapable of giving voluntary consent to sexual contact with their keepers. The motivation behind these virtually universal statutory rape provisions stems from an understanding of an inherent power imbalance between guard and inmate, analogous to the inherent power imbalance between adult and child.[168]

It is a Class G felony in Delaware for "an employee working at a detention facility" to engage in sex "with a person in custody on the premises of a detention facility."[169]

Although there is not a Delaware statute declaring sex between an arrestee and her arresting officer nonconsensual,[170] arrestees, like prisoners, surrender their

---

[168] Hannah Brenner et. al., *Bars to Justice: The Impact of Rape Myths on Women in Prison*, 17 GEO. J. GENDER & L. 521, 546 (2016).

[169] 11 *Del. C.* § 1259. In their arguments about consent, the parties cite two United States District Court for the District of Delaware cases that look to 11 *Del. C.* § 1259 in their discussions of whether consent should be a defense to an inmate's Eighth Amendment claim against a corrections officer for sexual assault. The cases have opposing outcomes: *Carrigan* found that consent cannot be a defense, and *Phillips* found that it can be. *Carrigan v. Davis*, 70 F. Supp. 2d 448 (D. Del. 1999); *Phillips v. Bird*, 2003 WL 22953175 (D. Del. Dec. 1, 2003). We agree with *Carrigan* that:

> it is of no import, whether as a factual matter, the Plaintiff invited [the officer] into her room or initiated the sexual encounter. Even if the Plaintiff did these things [which the plaintiff contends she did not do], it does not alter [the officer's] special responsibilities toward the Plaintiff based on his control and supervision over her.

*Carrigan v. Davis*, 70 F. Supp. 2d 448, 461 (D. Del. 1999). *Phillips* distinguished itself from *Carrigan* on the grounds that the plaintiff in *Phillips* conceded that she "voluntarily and willingly" had sex with the corrections officer, and the court found "absolutely no evidence in the record" that the "plaintiff engaged in sexual acts with defendant [] against her will, or that a coercive *quid pro quo* scheme was in place." *Phillips*, 2003 WL 22953175, at *6. But because of the coercive relationship between an inmate and a prison guard, whereby the inmate may fear saying that the sex was not consensual for fear of repercussion, we are not persuaded that the inmate's admission that the sex was consensual should be taken at face value. And, as a policy matter, even an inmate's consent should not waive the corrections officer's professional responsibility to the inmate to refrain from engaging in sexual acts with her.

[170] New York recently passed such a statute, clarifying that arrestees are incapable of consenting to sex while under arrest. N.Y. Penal Law § 130.05(3)(j); Luis Sanchez, *New York Lawmakers Pass Bill Banning Police from Having Sex with People in Custody,* THE HILL (Mar. 31, 2018), http://thehill.com/homenews/state-watch/381093-new-york-closes-loophole-allowing-police-to-

freedom and safety to the State under our criminal law,[171] and are subject to the coercive authority of the officers holding them in custody.[172] Other states have passed statutes specifically providing that an arrestee is not in a position to consent to sex with the officer holding her under arrest.[173] We view it as critical that our

have-sex-with-people-in. But thirty-four other states arguably allow consent to be "used as a defense when a police officer is charged with raping a person in his custody." Katharine Bodde & Erika Lorshbough, *There's No Such Thing as "Consensual Sex" When a Person is in Custody*, ACLU (Feb. 23, 2018), https://www.aclu.org/blog/criminal-law-reform/reforming-police-practices/theres-such-thing-consensual-sex-when-person (citing Albert Samaha, *This Teenager Accused Two On-duty Cops of Rape. She Had No Idea the Law Might Protect Them*, BUZZFEEDNEWS (Feb. 7, 2018), https://www.buzzfeed.com/albertsamaha/this-teenager-accused-two-on-duty-cops-of-rape-she-hadno?utm term=.se4ELg61p#.yrMJag6ke (reviewing all fifty states' penal codes, finding that thirty-four states lack a statute like New York's making sex between an arresting officer an automatic sex crime (*i.e.*, rape, sexual assault, sexual battery, sexual misconduct, or sex offense), and counting Delaware in those thirty-four states)); *Close the Police Rape Loophole*, N.Y. TIMES (Feb. 12, 2018), https://www.nytimes.com/2018/02/12/opinion/police-rape-loophole.html (same).

[171] 11 *Del. C.* § 1257.

[172] *See, e.g.*, Megan Coker, *Common Sense About Common Decency: Promoting a New Standard for Guard-on-Inmate Sexual Abuse Under the Eighth Amendment*, 100 VA. L. REV. 437, 443 (2014) ("[T]he coercive environment of imprisonment and the position of power guards enjoy over inmates suggest inmates cannot really consent to sexual contact with their guards.").

[173] *E.g.*, Ga. Code Ann. § 16-6-5.1 (West) (defining "sexual assault" to include when an "employee or agent of a law enforcement agency and engages in sexual contact with such other individual who the actor knew or should have known is being detained by or is in the custody of any law enforcement agency"); Utah Code Ann. § 76-5-412 (West) (defining "custodial sexual misconduct" to include sex between a law enforcement officer and an arrestee and classifying the crime as a third degree felony); Conn. Gen. Stat. Ann. § 53a-71 (West) (defining "sexual assault in the second degree" to include sexual intercourse when the "other person is in custody of law . . . and the actor has supervisory or disciplinary authority over such other person"); Fla. Stat. Ann. § 794.011 (West) (defining "sexual battery" to include "oral, anal, or vaginal penetration" when "[t]he offender is a law enforcement officer, correctional officer, or correctional probation officer . . . or any other person in a position of control or authority in a probation, community control, controlled release, detention, custodial, or similar setting, and such officer, official, or person is acting in such a manner as to lead the victim to reasonably believe that the offender is in a position of control or authority as an agent or employee of government"); Ohio Rev. Code Ann. § 2907.03 (West) (defining "sexual battery" to include sexual conduct when "[t]he other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person"); Or. Rev. Stat. Ann. § 163.452 (West) (defining "custodial sexual misconduct," a class C felony, to include sex with someone "in the custody of a

common law of torts, which by definition is a product of judicial decision-making, recognize the obvious realities set up by our own state criminal laws and the power they give to officers over those under arrest. For this reason, the "[l]iability of police departments [for the sexual assaults their officers commit] has been based on the extraordinary power over, as well as the unique access to citizenry provided by virtue of the fact that citizens are vulnerable and defenseless when a police officer is the tortfeasor."[174]

Of course, we recognize that there could be cases where an arrestee proposes sex to an officer in order to escape responsibility for the crime for which she was arrested. But that scenario, in which the officer accepts the arrestee's advances,

---

law enforcement agency following arrest" ); Wash. Rev. Code Ann. § 9A.44.160 (West) (defining "custodial sexual misconduct," a class C felony, to include "[w]hen the victim is being detained, under arrest[,] or in the custody of a law enforcement officer and the perpetrator is a law enforcement officer"); Ariz. Rev. Stat. Ann. § 13-1412 (defining "unlawful sexual conduct" as a felony that includes when "[a] peace officer . . . knowingly engag[es] in sexual contact, oral sexual contact or sexual intercourse with any person who is in the officer's custody or a person who the officer knows or has reason to know is the subject of an investigation," but providing an exception for when the officer is married or in a "romantic or sexual relationship" with the other person"); Alaska Stat. Ann. § 11.41.425 (West) (defining "sexual assault in the third degree" to include when a police officer "engages in sexual penetration with a person with reckless disregard that the person is in the custody or the apparent custody of the offender, or is committed to the custody of a law enforcement agency").

[174] 1 J. D. LEE & BARRY A. LINDAHL, MODERN TORT LAW: LIABILITY AND LITIGATION § 7:12 (2d ed. 2008).

involves criminal conduct by the officer,[175] and also by the arrestee.[176] To our mind, scenarios like this exemplify why voluntary consent is inconsistent with the context of an arrest, because everything about the sex is transactional and involves a tool to escape being a captive.[177]

We also must address the State's position on consent here, which we view as embracing the Officer's last statement about his conduct, and being inconsistent with its prior decision to charge him not only with "intentionally compel[ling] or induc[ing] [Doe] to engage in sexual penetration/intercourse," but also with "solicit[ing] a personal benefit from another person for having violated his duty" to

---

[175] 11 *Del. C.* § 1203 ("(a) A public servant is guilty of receiving a bribe when the public servant solicits, accepts or agrees to accept a personal benefit from another person upon an agreement or understanding that the public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. . . . (c) A public servant is guilty of receiving a bribe when the public servant solicits, accepts or agrees to accept a personal benefit from another person for having violated the public servant's duty as a public servant."); *id.* § 1343(a) ("A person is guilty of patronizing a prostitute when: (1) Pursuant to a prior agreement or understanding, the person pays a fee to another person as compensation for that person's having engaged in sexual conduct with the person; or (2) The person pays or agrees to pay a fee to another person pursuant to an agreement or understanding that in return therefor that person or a third person will engage in sexual conduct with the person; or (3) The person solicits or requests another person to engage in sexual conduct with the person in return for a fee.").

[176] *Id.* § 1201 ("A person is guilty of bribery when: (1) The person offers, confers or agrees to confer a personal benefit upon a public servant upon an agreement or understanding that the public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced; or . . . (3) The person offers, confers or agrees to confer a personal benefit upon a public servant for having violated a duty as a public servant."); *id..* § 1342(a)(1) ("A person is guilty of prostitution when the person engages or agrees or offers to engage in sexual conduct with another person in return for a fee.").

[177] *Cf. Wood v. Beauclair*, 692 F.3d 1041, 1047 (9th Cir. 2012) ("The power dynamics between prisoners and guards make it difficult to discern consent from coercion. Even if the prisoner concedes that the sexual relationship is 'voluntary,' because sex is often traded for favors (more phone privileges or increased contact with children) or 'luxuries' (shampoo, gum, cigarettes), it is difficult to characterize sexual relationships in prison as truly the product of free choice.").

70

bring Doe in on her *capias*.[178]  Both charges are inconsistent with the Officer's statement that Doe only asked him to help her with her charges after becoming amorous with him and then performing oral sex on him.  The Officer of course had to say that or otherwise confess to the crimes of accepting a bribe and official misconduct at the very least.

But even if one accepts the Officer's story as creating some dispute of fact about what happened, his own story illustrates why voluntary consent is not possible in the context of Doe's arrest.  Although the Officer claimed that Doe said nothing about favorable treatment until after the sex was over, he also said that she said "[i]f there is anything you can do with my charges, I would appreciate it" after he let her go.[179]  In other words, even the State's tenuous embrace of the Officer's second story—which came after he was caught in a lie—shows the inherently coercive and transactional, not voluntary, nature of any sex between an arrestee and her arresting officer.

For these reasons, we hold that an arrestee cannot provide voluntary consent to sex with her arresting officer.

---

[178] App. to Opening Br. at 134 (Complaint and Warrant for [the Officer]).
[179] *Id.* at 117 (Interview of [the Officer]).

71

## F. Risk Allocation

Before closing, we address the State's core argument that the risk of misconduct in cases like these should be borne by plaintiffs like Doe, and not imposed on employing police agencies. We understand that other jurisdictions have taken that approach and left victims to recover only against wrongdoing officers themselves, most of whom are unlikely to have the personal wealth necessary to satisfy a judgment of any sizeable kind.

Consistent with the policy judgment of § 219, the unique context of cases of this kind makes it sensible in our view for *respondeat superior* liability to exist. Victims are poorly positioned to protect themselves from wrongful sexual misconduct by arresting officers because, by law, they are not supposed to use even peaceable means to resist arrest, and the gantlet required to successfully bring and prove a case like this is daunting at best.

By contrast, police agencies are well positioned through careful hiring, training, and other practices to address the risk of sexual misconduct by their officers. The State Police already engages in some of these activities, including training officers on the proper way to interact with the public,[180] and efforts to monitor the time officers spend with arrestees to ensure that it is not suspiciously

---

[180] App. to Opening Br. at 384 (Colonel MacLeish Testimony Tr.).

long.[181] With developments such as body cameras and other technologies providing both video and audio monitoring of police contact with the public, police agencies should, we hope, be even better positioned to deter and prevent sexual wrongdoing by police officers.[182] Absent the potential for *respondeat superior* liability, however, the incentives for police agencies to take these steps will be diminished and the risk of misconduct placed on a class of victims poorly positioned to protect themselves.

### IV.      Conclusion

For the reasons we have discussed, we vacate the jury verdict in this case. Because there are no remaining disputes of fact relevant to liability, Doe is entitled to judgment as a matter of law on that issue against the State Police. On remand, the Superior Court shall enter judgment in Doe's favor on the issue of liability. If the parties are unable to resolve the sole remaining issue in this case, that of damages, after good faith discussions, the Superior Court shall hold a trial on that issue.

---

[181] *Id.* ("You are told whenever you transport a person of the opposite sex, to call in your mileage. So your mileage is recorded, and typically, that is one of those things that is shared, the reason why you do not cross those lines.").

[182] For example, when officers wear body cameras, that footage can be used to confirm their innocence or an assault victim's alleged version of events. *See*, *e.g.*, *Former Police Officer Pleads Guilty to Attempted Sexual Assault* (Apr. 21, 2018), CBS DENVER, http://denver.cbslocal.com/2018/04/21/former-pueblo-officer-sexual-assault/ ("[Officer] Candelaria was arrested in November 2016 after a woman reported that he assaulted her after she called for help in a domestic violence case. . . . Authorities say the officer's body camera showed him having a sexual conversation with the woman, and then the body camera was turned off. The officer later admitted he had contact with the woman.").

**VALIHURA**, Justice, dissenting; joined in part[*] by **VAUGHN**, Justice:

For the reasons explained herein, I decline to join my learned colleagues in the Majority.

As the Majority acknowledges, its decision is an about-face from precedent—not just under Delaware Law, but also from our two prior decisions in this litigation, which began nearly eight years ago.

On August 18, 2010, Doe filed this civil suit against a Delaware State Police officer ("Officer") and the State. She alleged that the Officer committed the torts of assault, battery, and rape while she was in his custody following her arrest, and that the State must be held liable for damages "pursuant to the principles of agency and/or the doctrine of *respondeat superior*." On May 7, 2012, the Superior Court granted the State's motion for summary judgment. In doing so, the trial court found, as a matter of law, that the Officer was acting outside the scope of his employment when he committed such acts and, thus, the State could not be held liable under *respondeat superior*. The Majority agrees that that should have been the right result applying the law as it existed then.

But, on appeal, this Court reversed the Superior Court's grant of summary judgment to the State. In our opinion in *Doe v. State* (*Doe I*),[1] this Court—with a

---

[*] Justice Vaughn joins in part, as reflected in footnote 39 of his dissenting opinion.
[1] 76 A.3d 774 (Del. 2013) (en banc).

different composition of jurists—held that the question of whether the Officer was acting within the scope of his employment was fact-specific under the long-accepted test for *respondeat superior* liability, borrowed from Section 228 of the Restatement (Second) of Agency (the "Restatement"),[2] and, as such, was a question for the jury to decide. Accordingly, on September 12, 2013, we reversed and remanded the matter to the Superior Court for further proceedings.

On July 29, 2014, the Superior Court again granted summary judgment for the State. This time it did so finding that the State was shielded from liability under the doctrine of sovereign immunity. The trial court denied Doe's motion for summary judgment because, under the law of the case, as this Court held in *Doe I*, the jury had to decide certain factors relevant to determining whether the tortfeasor acted within the scope of employment so as to satisfy the requirements for *respondeat superior* liability. Later, on April 8, 2015, the Superior Court also granted the Officer's estate's motion to dismiss because 12 *Del. C.* § 2102(a) requires that all claims against an estate be asserted within eight months following the death of the decedent, and Doe had first brought suit fifteen months after the Officer passed away. Doe appealed those rulings.

---

[2] Restatement (Second) of Agency (1958) [hereinafter Restatement].

Then, in *Sherman v. State* (*Doe II*),[3] this Court, sitting en banc, reversed on sovereign immunity: the State waived that defense because its insurance policy covered the Officer's acts. But we affirmed the Superior Court's ruling denying Doe's motion for summary judgment. We stated that "[t]he Superior Court [had] correctly determined that our 2013 holding is the law of the case," and we reaffirmed *Doe I's* holding that the scope of employment issue presented questions for the jury.[4]

We also affirmed the trial court's dismissal of the Officer's estate as a defendant. Thus, a finding of liability against the State was the only means for the estate of Doe, who had since passed away, to recover damages.

On remand, following a three-day civil trial, the jury found that the State was not liable for the allegedly tortious conduct of the Officer. On May 8, 2017, the Superior Court denied Doe's motions for a new trial and to set aside the verdict. This appeal followed.

Doe's arguments on appeal focus on the alleged defects in the jury instructions (which all parties agree are correct as a matter of law), the permissibility of certain defenses, and the propriety of the State's closing argument at trial. Yet the Majority goes far beyond Doe's precise arguments. Absent the request of any party, the Majority reverses our holding in *Doe I* that the third factor of the test for *respondeat*

---

[3] 133 A.3d 971 (Del. 2016) (en banc).
[4] *Id.* at 979.

3

*superior* liability—whether the Officer was motivated at least in part by a desire to serve his employer in committing the tortious acts—"has been construed broadly as a matter for the jury to decide."[5]  The Majority also *sua sponte* reverses our decision in *Doe II* to let that decision stand as law of the case.

And the Majority travels even beyond reversing two of our prior decisions in this same litigation, which, standing alone, the Majority acknowledges would have required finding for the State.  For policy reasons, it refuses to apply the recognized test in Delaware for adjudicating claims of r*espondeat superior* and instead adopts a new test, from Restatement Section 219(2)(d)—never before applied in Delaware, and rarely adopted in other states.  The end result is that the Majority rules for Doe as a matter of law.

The Majority points to a narrow exception to the law of the case doctrine and asserts that adhering to our prior rulings would produce an "injustice."  But the alleged injustice is based on an incorrect premise, as explained below, and there is no precedent for applying that exception under circumstances presented here.  Even more, the Majority *sua sponte* imposes a novel, non-delegable duty on the State to guard against seemingly all intentional torts committed by law enforcement officers against arrestees.  In doing all of this, the Majority has usurped the role of our General Assembly in determining major policy decisions concerning the

---

[5]  76 A.3d at 777.

4

apportionment of tort liability. We have declined to engage in such "acts of creation" not only in the torts arena, but also recently in other contexts,[6] and we should do so here. I address each point in turn.

I.

First, there is no basis to ignore the law of the case doctrine and reverse course on *Doe I* and *Doe II*. "The law of the case doctrine, like the *stare decisis* doctrine, is founded on the principle of stability and respect for court processes and precedent."[7] We have noted that the doctrine is designed to bring "some closure to matters already decided in a given case by the highest court of a particular jurisdiction, particularly when (with a different composition of jurists) that same court is considering matters in a later phase of the same litigation."[8] Like *stare decisis*, the law of the case doctrine is justified because "[[e]xcessive] disturbance of prior rulings would be taken as evidence that justifiable reexamination of principle had given way to drives for particular results in the short term."[9] In *SIGA*

---

[6] *See, e.g.*, *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 348 (Del. 2017) (en banc) (refusing to establish a presumption by "judicial gloss" and "declin[ing] to engage in that act of creation . . . ."). There, we observed that we lacked "confidence in our ability to craft, on a general basis, the precise pre-conditions that would be necessary to invoke a presumption of that kind." *Id.* at 366.

[7] *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000).

[8] *Id.*

[9] *Id.* at 1182 (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 866 (1992)); *id.* ("[F]requent overruling would overtax the country's belief in the Court's good faith . . . . The legitimacy of the Court would fade with the frequency of its vacillation." (quoting *Casey*, 505 U.S. at 866)). *See also State v. Barnes*, 116 A.3d 883, 891 (Del. 2015) ("The doctrine of *stare decisis* exists to protect the settled expectations of citizens because, '[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct

5

*Technologies, Inc. v. PharmAthene,*[10] a majority of this Court noted that "despite SIGA's concerns about the precedent set in *SIGA I*, the decision is the law of the case."[11] We also adhered to our prior decisions in that case because, like here, "[w]hether [the prior appeal] was correctly decided was not raised by the parties and [was] not before us on appeal."[12]

However, we have stated that the doctrine is "not inflexible."[13] As such, we have recognized three exceptions where it may be overcome: when a prior decision is (1) "clearly wrong," (2) "produces an unjust result," or (3) "should be revisited because of changed circumstances."[14]

Here, Doe did not raise any argument that the prior decisions of this Court were "clearly wrong," or incorrectly decided because they overlooked Section 219(2)(d), or that the law of the case doctrine should be ignored.[15] Doe did argue for the application of Section 219(2)(d) in *Doe I*. But we implicitly rejected that

accordingly.'" (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994))); *id.* n.40 ("To overturn a decision settling one . . . matter simply because we might believe that decision is no longer 'right' would inevitably reflect a willingness to reconsider others. And that willingness could itself threaten to substitute disruption, confusion, and uncertainty for necessary legal stability." (quoting *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008))).

[10] 132 A.3d 1108 (Del. 2015).

[11] *Id.* at 1138.

[12] *Id.*

[13] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 39 (Del. 2005).

[14] *Id.*

[15] In fact, Doe's main quibble was with the trial court's jury instructions, which she concedes were correct as a matter of law.

request in declining to adopt it and, instead, chose to rely on the ordinary test for *respondeat superior* liability articulated in Section 228.

And we even applied the law of the case doctrine in this very case, in our opinion in *Doe II*, when responding to Doe's argument that the Motivation Prong should not go to the jury because the facts bearing on the issues that would ordinarily go to a jury were "truly uncontested."[16]  We expressly denied her request based on the law of the case doctrine because, in *Doe I*, we had  "held that the question of whether an employee acted in the scope of employment 'is ordinarily one for decision by the jury,'"[17]  and observed that on remand the Superior Court had "correctly determined that our 2013 holding [in *Doe I*] is the law of the case . . . ."[18] As such, it "properly denied Doe's motion for summary judgment."[19]

---

[16] *Doe II*, 133 A.3d at 979.

[17] *Id.* (quoting *Draper v. Oliviere Paving & Constr. Co.*, 181 A.2d 565, 569 (Del. 1962)).

[18] *Id.*

[19] *Id.*  In addition to *Doe II*'s reaffirmation of *Doe I*'s holding that the Motivation Prong is a jury question, we reinforced that same precedent in *Hecksher v. Fairwinds Baptist Church, Inc.,* when we relied on *Doe I* for the proposition that "[t]he question of whether a tortfeasor is acting within the scope of his employment is fact-specific, and, ordinarily, is one for the jury to decide."  115 A.3d 1187, 1200 (Del. 2015) (quoting *Doe I*, 76 A.3d at 776); *see also id.* at 1203 n.62 (citing with approval our holding in *Doe I* that "the question of whether a police officer's rape committed while he was arresting the victim was committed solely for personal reasons could not be resolved on a motion for summary judgment."  (citing *Doe I*, 76 A.3d 774)).  Doe even acknowledges that, in the out-of-state precedent she relies upon—*Mary M. v. City of Los Angeles*, 814 P.2d 1341 (Cal. 1991), and *Doe v. Forrest*, 853 A.2d 48 (Vt. 2004)—the California Supreme Court and the Vermont Supreme Court, respectively, held that the *respondeat superior* issue before them presented a question of fact.  *See, e.g.*, *Mary M.*, 814 P.2d at 1347 ("[T]he question of whether [the officer] acted within his scope of employment was properly left for the jury to decide.").

7

Here, the only changed circumstance is the composition of this Court. And that alone is not enough to trigger the exception. The public should not have to worry that our case law will vacillate with every change in the makeup of the Court.

In relying on the "unjust result" exception, the Majority breathes new life into arguments that Doe chose not to re-assert in this appeal. It rests the claimed "injustice" on the false premise that "our earlier failure to give more precise consideration to the specific questions of law presented by this case left the Superior Court and the parties without the ability to get a ruling on their dispute that took into account the precise arguments they were making."[20] There is no precedent that requires this Court to address all arguments asserted by the parties. Setting such precedent can potentially destabilize our law.[21] Similarly, I am not aware of any instance where the "unjust result" exception has been triggered on account of jury instructions that, even if not ideally stated, all parties agree constitute accurate statements of the law.[22] Further, the "unjust result" exception is even more difficult

---

[20] Majority Op. at 5.

[21] Further, it can create inefficiencies by not allowing the Court to narrow holdings where appropriate and possible, and it would force the Court to rule on issues only tangentially presented to the Court by parties and without the benefit of a full presentation.

[22] The instruction given on course and scope of employment was consistent with Delaware law and supplemented the pattern jury instructions. *See Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del. 2002) ("[J]ury instructions must give a correct statement of the substance of the law and must be 'reasonably informative and not misleading.'" (quoting *Cabrera v. State*, 747 A.2d 543, 544 (Del. 2000))). It was also nearly identical to the language this Court used in *Doe I* when discussing Section 228.

8

to justify when its application involves, as here, overturning a jury verdict. This should not be done lightly.[23]

## II.

No doubt, the Majority's desire to clarify the requirements of the Motivation and Foreseeability prongs is based upon a sincere desire to be helpful to future litigants. But if it were to limit its revisiting of the law of the case to the law as it existed when the litigation was taking place, then summary judgment should have been granted in favor of the State—not Doe. The Majority does not dispute this.[24]

This approach is consistent with the weight of authority. The highest courts of numerous states[25] and many federal courts[26] have found that such wrongful

---

[23] *See Shapira v. Christiana Care Health Servs., Inc.*, 99 A.3d 217, 224 (Del. 2014) ("'Under Delaware law, enormous deference is given to jury verdicts,' and they should not be disturbed unless 'the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result.'" (quoting *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997); then *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979))). Further, for the sound policy reasons undergirding the law of the case doctrine, this "unjust result" exception traditionally is, and must be, construed narrowly. I was able to locate only a few instances where the "unjust result" exception has been applied: where prior rulings were "too speculative," in *Wilmington Med. Ctr. v. Coleman*, 298 A.2d 320, 322 (Del. 1972); and where the State was insisting upon applying the law of the case despite having conceded that the law stated by the Court had been incorrect, in *Cobb v. State*, 676 A.2d 901, 1996 WL 145793, at *1 (Del. 1996) (Table). The situation here is a far cry from such scenarios.

[24] *See* Majority Op. at 47 ("If Doe was required to satisfy the Motivation Prong of § 228, she could not, and judgment was owed to the State on that ground.").

[25] *See, e.g.*, *West Virginia Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 769-70 n.25 (W. Va. 2014) ("There is overwhelming majority support in other jurisdictions concluding that sexual assaults committed on the job are not within the employee's scope of employment.") (collecting cases).

[26] *See, e.g.*, *Rabon v. Guardsmark, Inc.*, 571 F.2d 1277, 1279 (4th Cir. 1978) (holding that sexual assault committed by an employee is outside of the scope of his employment) ("The assault by [a private security guard] was manifestly not in furtherance of [his employer, a private security agency's] business; it was the converse of [its] purpose that of providing protection and that for

9

conduct—sexual assault—is not in service of the employer as a matter of law and denied *respondeat superior* liability on that basis.

## III.

Instead of applying Section 228—which, as the Majority agrees, "our State has embraced . . . for decades now"[27]—and granting summary judgment to the State, the Majority relies on Section 219(2)(d)'s "aided in accomplishing the tort by the existence of agency relation" prong (the "Agency Relation Prong"), a provision never before embraced by Delaware courts. Only one jurisdiction (Vermont) has applied Section 219(2)(d) to allow for the imposition of vicarious liability on the

---

which it was employed."); *City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 202-03 (5th Cir. 1965) (holding police officer's sexual assault of victim outside the scope of his employment) ("The facts, construed most favorably for the appellee, will admit of no inference other than that in his rape of the plaintiff, Officer Mosely stepped aside from his employment to accomplish his own, rather than the City's purpose."); *Dockter v. Rudolf Wolff Futures, Inc.*, 684 F. Supp. 532, 536 (N.D. Ill. 1988) (holding that supervisor's assault of another employee was not in service of their employer because it was "committed entirely for his own enjoyment and benefit"), *aff'd*, 913 F.2d 456 (7th Cir. 1990); *Ho-Ching v. City & Cty. of Honolulu*, 2009 WL 1227871, at *13 (D. Haw. Apr. 29, 2009) ("[I]f Moniz did commit a sexual assault or sexual harassment, it was not the conduct for which he was hired as a police office[r] and by no means served the interests of Defendant."); *Valdez v. Church's Fried Chicken, Inc.*, 683 F. Supp. 596, 610 (W.D. Texas 1988) (holding that an employee's sexual assault of another was "purely personal and had nothing to do with the business," and thus outside the scope of his employment); *Hunter v. Countryside Ass'n For the Handicapped*, 710 F. Supp. 233, 239 (N.D. Ill. 1987) (holding that the employee's "alleged sexual assault can in no way be interpreted as further Countryside's business"). The United States Supreme Court has commented that sexual harassment might be different. Though "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment," the Court has observed that "[t]here are instances, of course, where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 757 (1998) (citing *Sims v. Montgomery Cty. Comm'n*, 766 F. Supp. 1052, 1075 (M.D. Ala. 1990)).

[27] *See* Majority Op. at 53 n.130. The Majority also agrees that "the § 228 test works well to fairly determine when *respondeat superior* liability is appropriate." *Id.*

10

government under these circumstances—sexual assault committed by its law enforcement officers.[28]  And it unabashedly does so based on the court's own policy determinations.[29]  The few other cases that invoke that provision in other contexts are similarly animated by policy concerns, but oftentimes those concerns are grounded in *legislation* announcing such policy concerns.[30]  There is no such legislation here.  And all of those cases applying the Agency Relation Prong resist going as far as the Majority does here: they avoid imposing what amounts to strict liability on local and state law enforcement agencies for sexual assaults committed by their officers.[31]

As the Majority explains, Section 219(2) outlines certain situations where vicarious liability may be imposed on employers when an employee acts *outside of*

---

[28] *Doe v. Forrest*, 853 A.2d 48, 57 (Vt. 2004).  But even there, the Vermont Supreme Court held as a matter of law that, under the Section 228 test, the officer could not have been motivated at least in part by a desire to serve his employer.  *Id.* at 55 ("Although Forrest's misconduct occurred while ostensibly on duty, we cannot conclude that coercing plaintiff to perform fellatio was conduct that was actuated, even in part, by a purpose to serve the county sheriff.  The act Forrest performed is so different from the acts he was authorized to perform that we can reach this conclusion as a matter of law.").  It then adopted Section 219(2)(d) for the first time.  *Id.*

[29] Also, the court in *Mary M.*, though not applying Section 219(2)(d), imposed liability for policy reasons.  *See* 814 P.2d at 1349 ("[E]ach of the three policy reasons supports the imposition of vicarious liability on the employer of a police officer who, while on duty, commits a sexual assault by misusing his official authority.").

[30] *See, e.g.*, *Hardwicke v. Am. Boychoir Sch.*, 902 A.2d 900, 920 (N.J. 2006) ("The [Child Sexual Abuse Act] imposes responsibility on those in the best position to know of the [child] abuse and stop it; application of section 219 of the *Restatement* to plaintiff's common-law claims advances those goals.").

[31] *See Doe v. Sipper*, 821 F. Supp. 2d 384, 392-93 (D.D.C. 2011) (denying company's motion to dismiss in order to allow the case to proceed to discovery on whether the company's Chief Operating Officer relied on his agency relation with another employee when raping her in his hotel room on a business trip).

11

*the scope of employment*. As set forth in subsection (d), vicarious liability may be imposed for such torts outside the scope of employment if the servant "purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of agency relation." The Majority relies on the second clause, the Agency Relation Prong, to impose liability on the State as a matter of law.

Courts have tread cautiously when asked to apply this Agency Relation Prong, and for good reason: applying it strictly according to the plain meaning of its terms would expose an employer to virtually unbounded liability. In fact, if not properly circumscribed, its application runs the risk of "swallowing agency law's general scope of employment rule" in Section 228, in making the exception greater than the rule.[32] As the United States Supreme Court has observed, "most workplace

---

[32] Daniel M. Combs, Case Note, Costos v. Coconut Island Corp.*: Creating a Vicarious Liability Catchall Under the Aided-by-Agency-Relation Theory*, 73 U. Colo. L. Rev. 1099, 1105 (2002). The comments to the Restatement and the transcripts of the drafting committee meetings suggest that the drafters were concerned about the potential for broad application of the Agency Relation Prong and attempted to limit its reach, even though the drafting committee never addressed these concerns through adjustments in the actual black letter text of the Restatement. Comment *e* provides a non-exhaustive list of two examples of situations that fit within the Agency Relation Prong, and they both involve deceit. The two examples in Comment *e* are also clear illustrations of situations that other provisions within the Restatement state already provide a basis for *respondeat superior* liability. Comment *e*'s first example of a situation engendering liability under the Agency Relation Prong states that a master may be liable where his agent, a telegraph operator, "sends false messages purporting to come from third persons." Restatement, *supra* note 2, § 219 cmt. e (citing § 261). Indeed, another provision in the Restatement, Section, 261 provides a basis for liability in such circumstances: "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *Id.* § 261. The second example is where "[t]he manager of a store operated by him for an undisclosed principal is enabled to cheat

tortfeasors are aided in accomplishing their tortious objective by the existence of the agency relation."[33]

When the United States Supreme Court addressed the applicability of Section 219(2)(d) (and its Agency Relation Prong) in a pair of decisions in 1998, in *Burlington Industries Inc. v. Ellerth*[34] and *Faragher v. City of Boca Raton*,[35] the Court took care to circumscribe its reach. It considered the Restatement because an

---

the customers because of his position." *Id.* (citing § 222). Again, Section 222 provides a basis for liability in such circumstances as it states that "[a]n undisclosed principal is subject to liability to third persons for conduct within the scope of employment of servants and of subservants employed for him by a servant or other agent empowered to employ them." *Id.* § 222. Further, "the deliberations preceding Section 219(2)(d)'s adoption demonstrate an intent to limit the section's application to cases involving apparent authority, reliance, or deceit." *Mahar v. StoneWood Transp.*, 823 A.2d 540, 546 (Me. 2003). The chairman of the drafting committee noted, "I have had the idea that I would like to see it confined (if nothing better can be had) to cases which are not criminal." Discussion of Restatement of the Law, Second, Agency (Tentative Draft No. 4), 33 A.L.I. Proc. 314, 383 (1956) (quoting Chairman John G. Buchanan). *See also* Alan J. Oxford, II, *When Agents Attack: Judicial Misinterpretation of Vicarious Liability Under "Aided in Accomplishing the Tort by the Existence of the Agency Relation" and Restatement 3rd's Failure to Properly "Restate" the Ill-Fated Section 219(2)(d) Provision*, 37 Okla. City U. L. Rev. 157, 180-81 (2012) ("What is clear from the 1956 Proceedings is that the ALI showed great hesitancy in extending vicarious liability to the case where the utility worker rapes the homeowner, even if he gained access into the home by showing his employer-issued badge. In addressing this example, the 1956 Proceedings take the position that no vicarious liability could attach and that no liability is intended by Section 219(2)(d). It is also clear that the ALI rejected liability under the Aided in Accomplishing language for theft, libel, and other 'crimes' . . . .").

[33] *Ellerth*, 524 U.S. at 760 ("Proximity and regular contact may afford a captive pool of potential victims. Were this to satisfy the aided in the agency relation standard, an employer would be subject to vicarious liability not only for all supervisor harassment, but also for all co-worker harassment, a result enforced by neither the [Equal Employment Opportunity Commission] nor any court of appeals to have considered the issue. The aided in the agency relation standard, therefore, requires the existence of something more than the employment relation itself." (citations omitted)); *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 226 (Mich. 2006) (declining to adopt Section 219(2)(d) and observing that "it is difficult to conceive of an instance when the exception would not apply because an employee, by virtue of his or her employment relationship with the employer is always 'aided in accomplishing' the tort.").

[34] 524 U.S. 742 (1998).

[35] 524 U.S. 775 (1998).

13

earlier decision, in *Meritor Savings Bank v. Vinson*,[36] held that, in deciding whether an employer could be held vicariously liable for claims under Title VII of the Civil Rights Act, "Congress wanted courts to look to agency principles for guidance in this area."[37]

In light of that dictate, the United States Supreme Court determined that the text of Section 219(2)(d), viewed through the lens of advancing the policy interests of Title VII, allowed employers to face vicarious liability for sexual harassment committed by their employee-supervisors if their commission was aided by the employees' agency relation to their employers.[38] But, recognizing the dangers of an expansive reading of Section 219(2)(d), the Supreme Court took care to avoid imposing strict liability on employers and, instead, limited *respondeat superior* liability to situations where "a supervisor takes a tangible employment action against the subordinate."[39] Such "tangible employment actions" are actions that "fall within the special province of the supervisor" who "has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees

---

[36] 477 U.S. 57 (1986).

[37] *See Meritor*, 477 U.S. at 72, cited in *Ellerth*, 524 U.S. at 754-55, and *Faragher*, 524 U.S. at 791-92.

[38] *Ellerth*, 524 U.S. at 761-62 ("When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation."); *Faragher*, 524 U.S. at 802 (using Section 219(2)(d)'s Agency Relation Prong as a "starting point" for determining vicarious liability). *See also Meritor*, 477 U.S. at 77 (Marshall, J., concurring in the judgment) ("[I]t is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.").

[39] *Ellerth*, 524 U.S. at 760.

14

under his or her control."[40]  The cases also allow the employer to assert an affirmative defense, which includes a showing that the employer instituted controls and training—an incentive consistent with Title VII's policy of "encouraging forethought by employers," such as through ex-ante prevention, "and saving action by objecting employees."[41]

In both *Ellerth* and *Faragher*, while it was outside the supervisor's scope of employment to sexually harass his supervisee, the Court determined that it made sense to hold the employer liable for the employee-supervisor's conduct when the employer had granted the supervisor the authority to make subsequent decisions affecting such employees.  In other words, the infraction could be described as "misuse of delegated authority."[42]  In contrast, here, the State did not give the Officer any such decision-making authority.  And, unlike in *Faragher* and *Ellerth*, where the Court was guided by the policies of Title VII,[43]  we have no legislative directive to guide our analysis.

---

[40] *Id.* at 762; *see also id.* at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *id.* at 762 ("Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. . . .  For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.").

[41] *Id.* at 764; *see also Faragher*, 524 U.S. at 807-08.

[42] *Ellerth*, 524 U.S. at 760.

[43] The United States Supreme Court submitted that its invocation of the Agency Relation Prong was driven by a prior case, *Meritor*, obligating it to "adapt agency concepts to the practical objectives of Title VII." *Faragher*, 524 U.S. at 802 n.3 (citing *Meritor*, 477 U.S. at 72).  The Court was not purporting to "make a pronouncement of agency law in general." *Id.*

In the years since *Faragher* and *Ellerth*, only one state supreme court has adopted the United State Supreme Court's reading of Section 219(2)(d)'s Agency Relation Prong to allow for the possibility of imposing *respondeat superior* liability on the state for the sexual assaults committed by police officers.[44] In that outlier case, *Doe v. Forrest*,[45] the Vermont Supreme Court acknowledged that its decision was guided by its own policy judgments for why the state should be held responsible for the acts of an officer outside the scope of his employment. The court deemed it proper to impose liability on the state because the state grants police officers "extraordinary power" and, as such, when an officer is the wrongdoer, his or her victim is "stripped of the official protection that society provides" and rendered "particularly vulnerable and defenseless."[46] And the court believed that it was

---

[44] *See Forrest*, 853 A.2d at 57. In the pre-*Ellerth* and *Faragher* era, the California Supreme Court held in *Mary M. v. City of Los Angeles* that *respondeat superior* liability may be imposed on the state when "a police officer on duty misuses his official authority by raping a woman whom he has detained." 814 P.2d at 1352. But, unlike the near strict liability imposed by the Majority's opinion here, that court also held that the question of whether the officer misused official authority in committing the rape is "a question of fact for the jury" and noted that, "[i]n this case, plaintiff presented evidence that would support the conclusion that the rape arose from misuse of official authority." *Id.* That court did not rely on Section 219(2)(d). In the years since, at least three justices of the California Supreme Court have noted that they believe *Mary M.* was "wrongly decided" and would overrule its imposition of vicarious liability on the state. *See Farmers Ins. Grp. v. Cty. of Santa Clara*, 906 P.2d 440, 459 (Cal. 1995) (Baxter, J., concurring) ("[W]hile I agree with Justice George that *Mary M.* was wrongly decided and should be overruled, I do not believe this case presents the proper vehicle because the facts here are amply distinguishable."); *id.* (George, J., concurring, with Lucas, C.J., joining) ("I would go further and overrule *Mary M.*, because I believe that case was wrongly decided. By declining to overrule that decision at this time, we run the risk that lower courts in future cases will feel constrained to follow the aberrant holding of that decision.").

[45] 853 A.2d 48 (Vt. 2004).

[46] *Id.* at 61.

important to incentivize the state to provide appropriate training and oversight. It stated that "[n]o incentive to prevent this kind of conduct is created by leaving the victim uncompensated."[47] The court remanded for the jury to consider evidence about whether the defendant officer had "special access to plaintiff: access created by the existence of the agency relationship that aided the commission of the tort."[48]

Because it is purely the result of judicial policy-making, the Majority's decision—though motivated by a desire to "clarify" the law—raises more questions than it answers. No doubt, our courts will be faced with requests to apply Section 219(2)(d) to a host of other situations.[49]

Further, the Majority, in focusing on its own assessment of how risks and costs ought to be allocated from a public policy standpoint, gives short shrift to Delaware's long-standing history of limiting rights of recovery against the State.[50] Our General Assembly has reflected this limitation of rights of recovery in the State Tort Claims Act.[51] Similarly, the County and Municipal Tort Claims Act provides that, "[e]xcept as otherwise expressly provided by statute, all governmental entities and their

---

[47] *Id.* at 62-63.
[48] *Id.* at 68.
[49] After *Forrest*, the Vermont Supreme Court entertained entreaties to extend its applicability to a range of other scenarios. For example, in *Doe v. Newbury Bible Church*, 933 A.2d 196 (Vt. 2007), answering a certified question from the Second Circuit, the Vermont Supreme Court determined that, under Vermont law, Section 219(2)(d) does not apply to "situation[s] involving tortious acts by a pastor." *Id.* at 198.
[50] *See* Majority Op. at 72-73.
[51] 10 *Del. C.* §§ 4001-05.

17

employees shall be immune from suit on any and all tort claims seeking recovery of damages."[52]

As both sides candidly acknowledged during the most recent oral argument before this Court, that the decision as to whether *respondeat superior* liability should be imposed is laden with policy questions. Among them are questions pertaining to how the risks and costs of such deviant conduct should be allocated. But, instead of allowing citizens (*i.e.*, taxpayers) and their representatives in the General Assembly to weigh in after debate—and instead of respecting the General Assembly's policymaking function—the Majority's holding effects a change in the law based entirely on its view of what the "proper" public policy should be and who should bear the risks (and costs) of wrongful conduct by a law enforcement officer.[53] And the Majority does so without any evidentiary showing that the public will benefit by

---

[52] 10 *Del. C.* § 4011. There are limited statutory exceptions for certain negligent acts or omissions. *See, e.g.*, 10 *Del. C.* § 4012.

[53] *See Shea v. Matassa*, 918 A.2d 1090, 1095-96 (Del. 2007) ("[W]e decline to create a new cause of action. We defer, as we should, to the General Assembly, which is uniquely situated to effectively examine the empirical data, hold public hearings, debate the social and economic issues implicated, and then decide whether Delaware should recognize dram shop liability."); *Justice v. Gatchell*, 325 A.2d 97, 102 (Del. 1974) ("The General Assembly has access to relevant information bearing upon these matters more significant than any afforded this Court, bound as it is by the limitations of the record of this judicial proceeding."); *see also Maguire v. State*, 835 P.2d 755, 759 (Mont. 1992) ("[M]ajor change to the respondeat superior doctrine is best left to the legislature."); *Niece v. Elmview Group Home*, 929 P.2d 420, 431 (Wash. 1997) ("Any needed redirection of social policy is more appropriately the function of the legislature." (quoting *Bratton v. Calkins*, 870 P.2d 981, 987 (Wash. Ct. App. 1994))).

18

spreading the cost of a rogue employee's conduct to the public entity (the State) and ultimately, potentially to taxpayers, instead of on the wrongdoer alone.[54]

The Majority reasoned that *respondeat superior* liability is appropriate because, without it, "the incentives for police agencies to take these steps [to deter and prevent sexual wrongdoing by police officers] will be diminished and the risk of misconduct placed on a class of victims poorly positioned to protect themselves."[55] I do not believe we should sit as a "superlegislature"[56] in this State and deprive our General Assembly of its proper role as the entity responsible for devising new forms of liability where appropriate, especially when based upon pure policy matters.[57]

---

[54] Importantly, this is not a case where anyone has suggested that the police department itself was negligent in hiring, training or supervising the Officer. As the dissenting justice in *Doe v. Forrest* rightfully questioned, "why is it fair or reasonable to burden the public with liability for a sexual assault perpetrated by a rogue employee solely for his own twisted personal gratification?" 853 A.2d at 74 (Skoglund, J., dissenting). The question of why the State (public) should bear the cost is a legitimate inquiry, particularly where there is no suggestion that the law enforcement agency was negligent in hiring, training, or supervising the officer. Here, all agree that the Officer's conduct was based upon his own selfish desire for sexual gratification at the expense of his detained suspect—rather than on advancing any interest of the State.

[55] Majority Op. at 73.

[56] *See Delaware Solid Waste Auth. v. The News-Journal Co.*, 480 A.2d 628, 634 (Del. 1984) (quoting *Pub. Serv. Comm'n v. Wilmington Suburban Water Corp.*, 467 A.2d 446, 451 (Del. 1983)).

[57] *See Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1257 (Del. 2011) (noting that the General Assembly "made a policy decision to set gross negligence as the floor—not the ceiling—for invoking [the Child Victim's Act's] applicability"); *Laws v. Webb*, 658 A.2d 1000, 1006 (Del. 1995) (noting that the General Assembly adopted comparative negligence to abolish the "'all or nothing' common law rule of contributory negligence," and, thus, the Court "perceive[d] no logical basis to retain the 'all or nothing' doctrine of last clear chance"), *overruled on other grounds by Lagola v. Thomas*, 867 A.2d 891, 892 (Del. 2005); *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 222-23 (Del. Ch. 2014) (noting that the General Assembly enacted the

I am reminded of Justice Wolcott's opinion in *Ciociola v. Delaware Coca-Cola Bottling Co.*,[58] where he cautioned against dispensing with common-law shields to liability without input from the legislature. He observed that, "It may well be desirable as a matter of public policy to impose absolute liability upon a manufacturer for injuries caused by defects in his product but, if such is to be the public policy of this State, it must be made so by the Legislative rather than the Judicial Branch of the Government, the function of which is not to change established law but to apply it."[59] The General Assembly responded in kind and passed 6 *Del. C.* § 2-318.[60]

## IV.

Equally concerning to me is the Majority's holding, borrowed from the intermediate appellate court in Indiana, that "a non-delegable duty exists as a 'matter of law' when 'patrons must surrender their control and autonomy to the entity while they are in its care.'"[61] Under this duty, the law enforcement agency is liable for any and all intentional torts committed by officers against those under the agency's control.

---

Delaware Uniform Contribution Among Tortfeasors Act in order to abolish "the common law ban on contribution" among joint tortfeasors).

[58] 172 A.2d 252 (Del. 1961).

[59] *Id.* at 257.

[60] *See Franchetti v. Intercole Automation, Inc.*, 523 F. Supp. 454, 456 (D. Del. 1981).

[61] Majority Op. at 61 (quoting *Cox v. Evansville Police Dep't*, 84 N.E.3d 678, 687 (Ind. Ct. App. 2017)).

20

The Majority, like the Indiana Court of Appeals' decision in *Cox v. Evansville Police Department*,[62] relies on Section 219(2)(c) of the Restatement, another exception to the scope of employment requirement for *respondeat superior* liability. Section 219(2)(c) provides that a master is liable for the torts of its servants if "the conduct violated a non-delegable duty of the master."[63]

The parties never mentioned the possibility of Section 219(2)(c)'s application until this appeal—after oral argument—and then only after being prompted by this Court for supplemental briefing on two questions. The first question asked whether the law of the case doctrine should give way. The second asked for the parties' views on the "extent to which certain principles of agency," including as discussed in *Cox v. Evansville*, "should bear on this Court's resolution of the issues on appeal."[64]

The non-delegable duty exception is extremely narrow, typically reserved for innkeepers and common carriers.[65] The logic behind imposing a non-delegable duty is grounded in contract and, as such, "the extent of this liability depends upon the duty assumed" by contract, as an innkeeper or common carrier.[66] The Restatement (Second) of Torts discusses such duties in the context of evaluating liability for

---

[62] 84 N.E.3d 678 (Ind. Ct. App. 2017).
[63] Restatement, *supra* note 2, § 219(2)(c).
[64] Letter from the Clerk of the Supreme Court of Delaware to Counsel (Mar. 5, 2018), available via File & Serve*Xpress*.
[65] *See, e.g.*, *Furek v. Univ. of Delaware*, 594 A.2d 506, 517 n.8 (Del. 1991).
[66] Restatement, *supra* note 2, § 214 cmt. a.

21

nonfeasance—where one fails to act in light of a duty to act.[67]  But that duty is a limited one: "[t]he duty in each case is only one to exercise reasonable care under the circumstances."[68]  Further, "[t]he defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured . . . ."[69]

This Court has never cited Section 219(2)(c), and the Superior Court has mentioned it only twice: first in rejecting an argument that such a duty should be imposed on private security agencies,[70] and later in rejecting an argument that a school district owed a non-delegable duty to a student who resided in the dormitories at its school for the hearing impaired.[71]

The Indiana opinion that extends such a duty to law enforcement officers is an outlier, decided in reliance on precedent peculiar to that particular jurisdiction.

---

[67] *See Rogers v. Christina Sch. Dist.*, 73 A.3d 1, 7-8 (Del. 2013) (citing Restatement (Second) of Torts §§ 314-20 (1965)).

[68] Restatement (Second) of Torts § 314A cmt. e.

[69] *Id.* cmt. f; *see also id.* § 320 ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor . . . .").

[70] *E. I. du Pont de Nemours Co. v. Spence Protective Agency, Inc.*, 1987 WL 8272, at *2 (Del. Super. Ct. Mar. 6, 1987) (citing *Rabon v. Guardsmark, Inc.*, 571 F.2d 1277 (4th Cir. 1978)).

[71] *Simms v. Christina Sch. Dist.*, 2004 WL 344015, at *8 (Del Super. Ct. Jan. 30, 2004) ("The plaintiff offers no Delaware authority, however, for the proposition that a School District should be held liable under this concept for torts of its employees which are outside the scope of their employment.  I decline to extend liability to the School District or its Board on this basis.").

And it is even more of a frail reed upon which to hang such a weighty holding given that it is currently on appeal to the Indiana Supreme Court.[72]

Moreover, that case arises in a context where Indiana law has developed differently from ours. Indiana's history of extending non-delegable duties began with the Indiana Supreme Court's opinion *Stropes v. Heritage House Children's Center of Shelbyville, Inc.*,[73] which held that a residential children's center held a non-delegable duty to its mentally disabled resident,[74] though it remanded the case for determination of whether the center's protection "fell short of the extraordinary standard of care which is imposed by the common carrier exception and which it assumed when it accepted [plaintiff] as a resident."[75] In *Robins v. Harris*,[76] the Indiana Court of Appeals held that "inmates are not precluded from recovering damages from a sheriff for injuries suffered by intentional wrongful acts of jail employees."[77] Similar precedent does not exist in this State.

This Court's unexpected, *sua sponte* adoption of the non-delegable duty principle—prompted only by its own post-argument question—is troubling, and

---

[72] Oral argument in the *Cox v. Evansville* appeal was held on February 15, 2018.

[73] 547 N.E.2d 244, 247 (Ind. 1989).

[74] Consistent with the contract-based roots of the non-delegable common carrier duty, the Indiana Supreme Court observed, in imposing such a duty on the children's care center, that the resident and center's "'contract of passage' contemplated that the entire responsibility for [the resident's] comfort, safety and maintenance would be on [the center] . . . ." *Id.* at 254.

[75] *Id.* at 254.

[76] 740 N.E.2d 914, 918 (Ind. Ct. App. 2000), *aff'd in part, vacated in part on other grounds*, 769 N.E.2d 586 (Ind. 2002).

[77] 740 N.E.2d at 918.

worries me greatly. Here is why: the consequences could prove devastating for our most vulnerable citizens, as aptly observed by our sister courts who have declined to go this route. Facilities that care for our most vulnerable citizens might react in ways unanticipated by the Majority. For example, fearing the risk of liability and saddled with greater insurance costs, they might avoid taking on the most severely disabled—or may not be able to afford to do so.

In *Davis v. Devereux Foundation*,[78] the New Jersey Supreme Court held that a charitable organization serving the developmentally disabled did not owe a non-delegable duty to a resident burned by boiling water that a counselor had poured on him. That court was motivated by similar concerns. It commented that, "[t]he imposition of liability upon these organizations for unforeseeable intentional acts of employees such as [the defendant employee] could jeopardize their continued existence, deter the founding of new providers that could deliver quality services, and increase the cost incurred by residents, families and the State in maintaining residents in institutional care."[79] The employee was criminally charged, convicted, and incarcerated for her assault on the resident.[80]

---

[78] 37 A.3d 469 (N.J. 2012).
[79] *Id.* at 487.
[80] *Id.* at 474. *See also id.* at 485 ("[A]s this case illustrates, the criminal justice system has a role in deterring and punishing conduct such as [the employee's].").

24

Similarly, in *Niece v. Elmview Group Home*,[81] the Supreme Court of Washington declined to hold a group home liable under this non-delegable-duty theory after an employee sexually assaulted a resident. That court echoed the same concerns, noting that "[t]he financial burden created by such strict liability might actually reduce the residential care industry's ability to provide quality care."[82] Washington's high court asked questions such as, "Would insurance against such liability be affordable or even available? Would the operators of group homes simply pass the cost of such liability on to the families of residents or to the State treasury? Or would commercial providers of residential care shy away from accepting responsibility for the most vulnerable disabled persons, those most in need of residential care?"[83] But the court conceded its inability to answer them and submitted "[i]t is particularly important to recognize the limits on our ability as an appellate court to decide complex questions of public policy where, as here, a decision to impose a new tort liability requires a consideration of factual matters extrinsic to the case before the court."[84] That court also noted that "[t]he legislature is uniquely able to hold hearings, gather crucial information, and learn the full extent of competing societal interests."[85]

---

[81] 929 P.2d 420 (Wash. 1997).
[82] *Id.* at 431.
[83] *Id.*
[84] *Id.*
[85] *Id.* (quoting *Burkart v. Harrod*, 755 P.2d 759, 761 (Wash. 1988)).

I share our sister courts' apprehension of the unintended consequences of imposing new duties, especially in the absence of appropriate input from the potentially affected constituencies and findings based upon evidentiary support.

V.

The potential impact of this decision is great. The Majority's decision now holds the State liable for the intentional sexual misconduct committed by a member of law enforcement acting entirely outside the normal scope of his work duties. It does so after reversing our own precedent in this very case and applying two sections of the Restatement never before embraced in this State. It also is unclear whether the holding applies only to law enforcement agencies, or whether every public (and private) employer will now be faced with lawsuits seeking to extend this ruling even beyond the law enforcement arena. Schools, daycares, nursing homes, and facilities for our State's most vulnerable citizens, and an untold number of other employers (including government agencies) might be held liable in money damages for the intentional torts committed by rogue employees with a purpose wholly divorced from the interest of the employee's employer.[86]

---

[86] Although we have recognized that, in certain instances, even the intentional unauthorized torts of an employee can be viewed as advancing the employer's interests, *see Draper v. Olivere Paving & Const. Co.*, 181 A.2d 565, 569-72 (Del. 1962), this Court has never held that an employer may be vicariously liable for a sexual assault committed by an employee.

26

Accordingly, I respectfully dissent. I would affirm the decision of the trial court.[87]

---

[87] I join Justice Vaughn's dissent to the extent that we both would affirm the decision of the trial court. As set forth herein, my path and reasoning in reaching that endpoint differ from his to some extent. But I agree with his view that this Court should decline to apply Section 219(2)(d) as well as Section 219(2)(c) in this case.

**VAUGHN**, Justice, dissenting; joined in part[*] by **VALIHURA**, Justice:

I cannot join the majority opinion because I do not agree with the majority's decisions on the foreseeability element of § 228 of the Restatement (Second) of Agency ("the Restatement"), the issue of consent, or the applicability of § 219 of the Restatement. I would affirm the judgment of the Superior Court. Since I would affirm the judgment of the Superior Court, I will begin by discussing the five arguments that Doe makes in her opening brief, in order.

The first argument Doe makes is that the trial court committed error in its scope of employment instruction. The instruction is set forth in full in the majority's opinion. Specifically, Doe argues "[t]he Instruction was erroneous because it failed to make clear that what had to be within the course and scope was [the police officer's] general activity and not specific wrongful activity occurring within that general activity."[1] This argument relates to the element of § 228 requiring that the wrongdoer's conduct be "actuated, at least in part, by a purpose to serve the master[.]"[2] Doe argues that this element of § 228 is satisfied, or could be found by a jury to be satisfied, because the officer was processing an arrest in the general course of his police duties when the tortious conduct occurred. She argues that the jury instruction should have more clearly informed the jury that it could find that the

---

[*] Justice Valihura joins in part, as reflected in footnote 87 of her dissenting opinion.
[1] Doe's Opening Br. 15.
[2] Restatement (Second) of Agency § 228(1)(c) (1958).

officer was acting within the scope of employment if he was carrying out police duties when the wrongful conduct occurred and need not find that the wrongful conduct itself was motivated by a desire to serve the employer.

The majority discusses this "motivation prong" of § 228 in detail and I need not do so here. I agree with the majority's conclusion that it makes sense, in the interest of justice, to depart from the law of the case on this issue in order to clarify the meaning of § 228's motivation prong. I also agree that the prong "requires that the wrongful act must itself be motivated in part by a desire to serve the employer."[3] And I agree with the majority that the officer's conduct was not motivated in any sense by a desire to serve the state police. It follows that Doe's first argument, in retrospect, must fail because she was not entitled to an instruction that the motivation element was satisfied if the officer was acting within the scope of general police activity at the time the wrongful activity occurred.

Doe next argues that the trial court erred by refusing to give a foreseeability instruction which she offered at trial and which the parties refer to as the "MacLeish Instruction." The MacLeish instruction was entitled "KNOWLEDGE OF COL. MACLEISH" and read as follows:

> In this case, Colonel MacLeish, the former head of the Delaware State Police in 2009, testified. If you find that Colonel MacLeish was aware of a general problem within law enforcement that some police officers had sexually assaulted people in their custody then it was not

---

[3] *See supra* p. 5–6.

2

completely unforeseeable to the State that such wrongful conduct could occur.

The general problem of sexual abuse by arresting police officers does not have to have involved the State Police or any police in Delaware-it is enough if on a nationwide basis there was a general problem.  Also, the problem did not have to involve a majority of police officers, it is enough if it were a very small number of officers.[4]

The trial court rejected the MacLeish Instruction and gave the following a pattern instruction on foreseeability:

A foreseeable act is one that an ordinary person, under the circumstances, would recognize or anticipate as creating a risk of injury.  It is not necessary that the particular injury suffered was itself foreseeable, but only that the risk of injury existed.[5]

The request for the MacLeish Instruction was based upon the testimony at trial of former Delaware State Police Colonel Thomas F. MacLeish, which included the following:

Q.  And would you agree with me that it is known in your business, at least as it existed when you retired back in 2009, is known, or was known in your business that a small, very small, but small percentage of police officers occasionally engage in sexual misconduct during the course of an arrest?
A.  Yes.  It is an extremely small percentage.  Yes, it is.
Q.  It hurts to have to admit that, doesn't it?
A.  It is true in any occupation out there and law enforcement, you are given the power and the authority and responsibility to take care of others.  And you do not ever cross that line. . . .  To ask me if there is anyone out there that has, yes, there has been a very, very small minority.[6]

---

[4] App. to Opening Br. at A0349.
[5] *Id.* at A0474.
[6] *Id.* at A0378–79.

3

It is well known that a party does not have a right to have a particular instruction in particular language as long as the instruction given is a correct statement of law.[7]

It is unusual to have an instruction which is tailored to a particular witness' testimony, as is the MacLeish Instruction. It refers to a "general problem" within law enforcement that some police officers commit sexual assaults, but Col. MacLeish's testimony did not speak of a "general problem." It states that if the jury found that there was such a general problem, "then it was not completely unforeseeable to the State that such wrongful conduct could occur."[8] The issue however, is foreseeability, or expectability, not whether conduct was "not completely unforeseeable." The instruction seems to be one asking the trial court to comment upon Col. MacLeish's testimony, and it seems designed to steer the jury in the direction of finding foreseeability. It is not a balanced instruction which simply informs the jury of the law. I see no error in the trial court's refusing to give the MacLeish Instruction and instead giving the pattern instruction. The standard instruction gave both sides full latitude to make their arguments on foreseeability.

I turn now to the majority opinion on the foreseeability element of § 228.[9] The majority states that "[t]he reality is that there is no question of fact in this case

---

[7] *Chavin v. Cope*, 243 A.2d 694, 698 (Del. 1968).
[8] App. to Opening Br. at A0349.
[9] Restatement (Second) of Agency § 228(1)(d) (1958).

4

that the Foreseeability Prong was satisfied."[10]  Relying in part upon alleged wrongful acts by state troopers that are included in a motion for partial summary judgment filed in the Superior Court but which apparently were not introduced at trial, and in part upon news and secondary sources which don't seem to have much in particular to do with Delaware and are not in evidence, the majority finds that foreseeability is established as a matter of law in any case where a police officer sexually assaults a detainee in the officer's custody.  I disagree with this conclusion for two reasons.

The first is that I think the doctrine of law of the case should bar reconsideration of this issue.  In *Doe II* we recognized that Col. MacLeish had testified by deposition that there is a risk that some police officers will engage in sexual assault, but we held that the foreseeability factor was a question for the jury.[11]  While I have agreed with the majority that the law of the case doctrine should give way on the motivation prong, I do not think that the interests of justice call for reconsideration of our ruling in *Doe II* on the foreseeability element of § 228.

Second, I think that a question of fact exists with regard to foreseeability and that the issue was properly submitted to the jury.  The trial court put it this way in an order denying Doe's motion for a new trial:

> Finally, Plaintiff argues there was overwhelming evidence on the issue
> of foreseeability to warrant a new trial.  This Court disagrees.  The only
> evidence presented regarding the foreseeability of sexual assault of

---

[10] *See supra* p. 47.
[11] *Sherman v. State*, 133 A.3d 971, 979 (Del. 2016).

5

arrestees by on-duty officers came from Colonel MacLeish's testimony that, as of 2009 when he retired from the Delaware State Police, an "**extremely small percentage**" of officers engaged in sexual misconduct during an arrest. However, two of [the officer's] supervisors testified that they were unaware of any allegations of sexual misconduct against him prior to the incident in question, and therefore, the jury was free to consider all of the testimony from the various law enforcement representatives on the issue of foreseeability.[12]

I agree with the trial court. Doe was not required to show that there was prior evidence of sexual misconduct on the part of the officer. The evidence that an extremely small percentage of officers engaged in sexual misconduct was enough to get her to the jury. But I think that all of the evidence referred to by the trial court, both the general evidence solicited from Col. MacLeish and the specific evidence solicited from the officer's supervisors, was admissible for the jury's consideration. And I think it was within the province of the jury to decide whether the evidence submitted was sufficient to rise to the level of establishing foreseeability.[13]

The third argument Doe makes in her opening brief is that unforseeability was an affirmative defense that had to be proven by the State. At trial, Doe tendered a proposed jury instruction entitled "COMPLETE UNFORESEEABILITY AS AN AFFIRMATIVE DEFENSE," which the trial court refused to give.[14]

---

[12] *Sherman v. State*, 2017 WL 19900268, at *3 (Del. Super. May 8, 2017) (emphasis added).

[13] *Marston v. Minneapolis Clinic of Psychiatry and Neurology, LTD.*, 329 N.W.2d 306, 311 (Minn. 1982) (rejecting a plaintiff's claim that foreseeability was established as a matter of law where there was testimony that "sexual relations between a psychologist and a patient is a well-known hazard" thus holding that foreseeability was a question of fact.).

[14] App. to Opening Br. at A0345.

6

In support of her third argument, Doe relies upon the cases of *Doe I*[15] and *Draper v. Olivere*.[16]  The facts of *Draper* are mentioned in the majority opinion and need not be repeated here.  These cases involved motions for summary judgment filed by defendants.  They discuss the burden on a moving party in that context.  They have no bearing on the burden of proof at trial.  The normal burden of proof was on Doe, as plaintiff, to prove each element of her claim by a preponderance of the evidence, including the element of foreseeability under § 228(1)(d).[17]  There was no error on the part of the trial court in refusing to give the instruction tendered by Doe.

Doe next argues that the State made an improper statement in closing argument.  The portion of the argument complained of is as follows:

> [Defense counsel]:  One of the elements as the Judge will instruct you is whether or not this was unexpected or foreseeable.  We submit to you it was not foreseeable.  You heard the testimony from Mr. MacLeish about the number of arrests that the State Police make in a course of a year, I think 100,000.  The State Police have been around for a longtime, 1920s.  Have you heard any other incidents like this being admitted through the course of this trial?  None.  None.  Is this foreseeable that this going to happen this one time?[18]

---

[15] 76 A.3d 774 (Del. 2013).
[16] 181 A.2d 565 (Del. 1962).
[17] *Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, 721 A.2d 1267, 1269–70 (Del. 1998) (citation omitted).
[18] App. to Opening Br. at A0463.

Plaintiff's counsel objected, the basis for his objection being that "[t]his is finessing the record. There was no testimony from Col. MacLeish about whether there had been any other sexual events, [the] record is barren on that."[19] The court overruled the objection and argument resumed.

Plaintiff's counsel argues that this portion of the State's argument went outside the record because Col. MacLeish did not testify as to the number of sexual misconduct complaints against state troopers over the force's history. However, it appears that counsel's argument was a correct summary and assessment of the evidence. Apparently, no specific instance of prior police sexual misconduct was introduced at trial. A party is entitled to argue that the opponent has failed to support an element of her claim. I see no error in the trial court's overruling the objection.

Doe's fifth and final argument in her opening brief involves the issue of consent. In the trial court, and on appeal, Doe argues that she should not have been required to prove that she did not consent to the sexual contact as part of her assault and battery claim. The trial court rejected her arguments, and instructed the jury that an element of her assault and battery claim was lack of consent on her part.

Doe contends that under principles of judicial admission and judicial estoppel, the State should not have been permitted to argue that she consented to the sex act with the officer. This argument is based on the fact that the State charged the officer

___

[19] *Id.*

8

with sexual extortion, soliciting a sexual bribe, and official misconduct as a result of the incident.

Judicial admissions are never conclusive and raise an estoppel only in the case in which they are made.[20] As to judicial estoppel, the charges of soliciting a sexual bribe and official misconduct do not implicate assault or a lack of consent on the part of the victim. Sexual extortion alleges in the alternative that a person compelled or induced another to engage in a sexual act. It does not by express terms charge that the sex occurred without the consent of the victim. The State did not charge rape or any other sexual offense in which an element is that the sexual contact occurred without the consent of the victim. Nor does the probable cause affidavit supporting the offenses allege that the sexual contact occurred without Doe's consent. "Judicial estoppel is an extreme remedy, to be used only 'when [a party's] inconsistent positions are 'tantamount to a knowing misrepresentation to or even fraud on the court.''"[21] I do not think that standard is established here and I see no error on the part of the trial court in rejecting Doe's arguments on judicial admission and judicial estoppel.

Doe's more significant argument is that she could not consent to the sexual contact as a matter of law because she was in custody. She relies upon a Federal

---

[20] *Rudnick v. Schoenberg*, 122 A. 902, 903 (Del. 1923).
[21] *Chao v. Roy's Const., Inc.*, 517 F.3d 180, 186 n. 5 (3d Cir. 2008) (citation omitted).

9

District Court opinion, *Carrigan v. Davis*,[22] and 11 *Del. C.* § 1259. The statute makes it a crime for people working at a detention facility to have sexual intercourse or sexual penetration with an inmate.[23] *Carrigan* involved such a case and was influenced by the statute. Neither the statute nor *Carrigan* have any direct application to this case. There is no comparable statute governing police detentions outside of a prison facility. I think *Carrigan* and the statute were properly distinguished by the trial court.

In this case, whether Doe consented to sex was properly determined by the trial court to be a question of fact. After initially denying the sexual contact occurred, the officer admitted it occurred but said that it was consensual. Despite the obvious credibility problem with his second story, the officer's statement was sufficient to create a question of fact for the jury.

I do not join in the majority's determination that sexual contact between an officer and a person in his custody is always without consent of the detainee as a matter of law, because I think it crosses the line between the proper role of the court and the jury.[24]

---

[22] 70 F. Supp. 2d 448 (D. Del. 1999).

[23] 11 *Del. C.* § 1259.

[24] The majority's research shows that some states have passed statutes prohibiting sexual contact between a police officer and a detainee in his custody. That research apparently does not reveal any judicial decision in which a court has held that a detainee in police custody cannot consent as a matter of law.

When Article IV, § 19 of the Delaware Constitution was being considered at the 1897 Constitutional Convention, delegate William C. Spruance (later Judge Spruance) stated that the object of the section is "that Judges shall confine themselves to their business, which is to adjudge the law and leave juries to determine the facts."[25] As judges we have heard over and over again that the "[m]embers of the jury. . . . are the sole and exclusive judges of the facts of the case."[26] I doubt the jury decided this case on the issue of consent. I think it far more likely that it decided it upon the issue of scope of employment. But I think the State is entitled to have the issue decided by a jury, not the court.

Finally, I address § 219 of the Restatement, beginning with § 219(2)(c).[27] The non-delegable duty exception to the general rule that employers are liable only for acts of employees committed within the scope of employment has generally been applied to common carriers and innkeepers.[28] One of the justifications for imposing a non-delegable duty upon common carriers and innkeepers is contractual.[29] The

---

[25] *Storey v. Camper*, 401 A.2d 458, 463 n.4 (Del. 1979) (quoting *II Debates and Proceedings of the Constitutional Convention of the State of Delaware*, p. 1730). Art IV, § 19 provides that "[j]udges shall not charge juries with respect to matters of fact, but may state the questions of fact in issue and declare the law."

[26] *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 711 (Del. Super. 1967).

[27] Restatement (Second) of Agency § 219 (1958).

[28] *See supra* p. 59–60 n. 151.

[29] "[T]he master may be under such a duty to the plaintiff that responsibility for the servant's acts may not be delegated to him. This is true in particular in those cases where the master, by contract or otherwise, has entered into some relation requiring him to be responsible for the protection of the plaintiff." *Rabon v. Guardsmark, Inc.*, 571 F.2d 1277, 1280 n.4 (4th Cir. 1978) (quoting W. Prosser, Law of Torts s 70, p. 465 (1971).

contract between the carrier and passenger, or innkeeper and guest, includes an implied assurance that the passenger or guest will transported or cared for safely, including the assurance that the passenger or guest will not be subjected to intentional torts of the carrier's or innkeeper's employees.[30]  No such contractual relationship exists between the State and a detainee.

While courts in Indiana have expanded the non-delegable duty exception, courts in other jurisdictions have refused to do so.  In *Davis v. Devereux*, the Supreme Court of New Jersey declined to impose a non-delegable duty upon a residential facility where an employee had committed an intentional tort against a resident who had severe autism and developmental disabilities.[31]  While *Davis* involved a residential facility, not a police department, the resident there was as dependent upon the facility for his care, safety, and protection as is a detainee in police custody.  *Davis* discusses other cases which have declined to expand the non-delegable duty exception.  It notes that in *Niece v. Elmview Group Home,* the Supreme Court of Washington declined to impose a non-delegable duty in a case involving a group home for developmentally disabled persons.[32]  In *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, which involved a sexual assault by a nursing assistant upon a semi-comatose, quadriplegic patient, the

---

[30] *Lainer v. Pullman Co.*, 105 S.E. 21, 24 (N.C. 1920).
[31] *Davis v. Devereux Foundation*, 37 A.3d 469, 485–86 (N.J. 2012).
[32] *Niece v. Elmview Group Home*, 929 P.2d 420 (Wash. 1997).

Supreme Court of Arkansas imposed a traditional duty of care upon the nursing care facility rather than a non-delegable duty.[33] *Davis* discusses other cases as well. I agree with *Davis* and the cases it discusses that "established tort law appropriately balance[s] the parties' interests."[34]

I would also decline to adopt the last clause of § 219(2)(d) as part of the common law of this state. In *Zsigo v. Hurley Medical Center*, the Supreme Court of Michigan rejected a contention that it should recognize § 219(2)(d).[35] In doing so, it noted the potential breadth of § 219(2)(d). "Because the exception is not tied to the scope of employment but, rather, to the existence of the employment relation itself, the exception strays too far from the rule of respondeat superior employer nonliability."[36] The court also rejected the dissent's assertion that the court had "the option of applying the exception in the same tailored manner as demonstrated by the Vermont Supreme Court in *Doe v. Forrest*."[37] The court recognized the "danger of adopting an exception that essentially has no parameters and can be applied too broadly."[38] I agree with the reasoning of the Supreme Court of Michigan.

For these reasons, I would affirm the judgment of the Superior Court.[39]

---

[33] 49 S.W.3d 107 (2001).
[34] *Davis*, 37 A.3d at 488.
[35] 716 N.W.2d 220, 226 (Mich. 2006).
[36] *Id.*
[37] *Id.* at 227.
[38] *Id.* at 229.
[39] I join in parts II, III, IV and V of Justice Valihura's dissent.